UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LASONA MCKINNEY,

               Plaintiff,

     v.

CHICAGO TRANSIT AUTHORITY,

               Defendant.

Case No. 20 C 6093

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Lasona McKinney has sued his current employer, Chicago Transit Authority ("CTA"), alleging that CTA created a hostile work environment based on race and in retaliation for his complaints of race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII), 42 U.S.C. § 2000e-5 *et seq*. Specifically, McKinney contends that in October 2018, he complained to CTA that he was being discriminated against by his foreman Joseph Simmons because of his race. After he complained, McKinney alleges he was subject to a "campaign of harassment" at the hands of Simmons and certain co-workers, which included the taking away of his CTA vehicle, leaving a toy rat at his work station, co-workers failing to assist him on joint projects, excluding him from work meetings and training, denying him necessary work materials, giving him unsafe work assignments, and leaving a noose in his workplace. CTA has moved for summary judgment on McKinney's Second Amended Complaint. For the reasons explained below, the motion [63] is denied.

## BACKGROUND[1]

Plaintiff Lasona McKinney, an African-American man, resides in Dolton, Illinois. Def's LR 56.1 Stmt. Material Facts ("DSOF") [65] ¶ 1; McKinney Declaration [70-1], ¶ 5. Defendant CTA is a metropolitan transit authority with headquarters and facilities in the Northern District of Illinois. DSOF ¶ 1. McKinney is an electrician by trade and was hired by CTA for light rail maintenance duty in July 2017. *Id.* ¶ 10. McKinney has never been formally written up by CTA for any issues in the workplace. *Id.* ¶ 22. In the Light Rail Maintenance group, McKinney works under the supervision of Joseph Simmons ("Simmons"). *Id.* ¶ 11. Simmons is the foreman for two separate groups of electricians: one group that works on light rail maintenance and another group that works on construction projects. *Id.*

There are approximately 20-30 electricians that participate in an annual "pick" where union members elect in order of seniority which division they will work in for the next calendar year. DSOF ¶ 11; Pl's Resp. DSOF [70] ¶ 11; McKinney Decl., ¶ 4. Groups of electricians participating in the pick include Light Rail Maintenance, North Facilities/Garages, South Facilities/Garages, and sometimes, the Subway group. McKinney Decl. ¶ 4. During the annual pick in May 2018, McKinney elected to stay in the Light Rail Maintenance group per his seniority. DSOF ¶ 12.

Several months later, in September 2018, Simmons moved McKinney against his will to the North Facilities/Garages Group. Pl's Resp. DSOF ¶ 12; McKinney Decl. ¶ 6. The parties

---

[1] The following facts are taken from CTA's Local Rule 56.1 statement, McKinney's response, and supporting exhibits. The Court construes all facts in the light most favorable to McKinney and draws all reasonable inferences in his favor. *Reives v. Illinois State Police*, 29 F.4th 887, 891 (7th Cir. 2022). CTA makes objections to nearly all the statements made in declarations proffered by McKinney, but CTA does not meaningfully develop its evidentiary objections. *See* Doc. 75 at 5-6; Doc. 75-1 at 1-13. Because almost all of CTA's evidentiary objections were not properly developed, they are waived. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Nevertheless, in setting forth the relevant facts, the Court addresses the evidentiary objections as necessary.

dispute the reason for Simmons's decision to transfer McKinney to another rail line after the annual pick. According to CTA, Simmons wanted McKinney to do a site rotation, commonly called a "tour," to learn the entire CTA system by working at different bus and rail job sites. Doc. 64 at 25; DSOF ¶ 13. CTA says every electrician must go through a rotation at some point in their career. *Id*. As evidentiary support, CTA relies, in part, on an affidavit by Terry Burnett, a stand-in foreman for the Light Rail Maintenance group when Simmons is absent, who states that new electricians are required to rotate through bus and rail systems to familiarize themselves with different job sites. Burnett Decl. [65-2 at 180-81] ¶¶ 4, 5.

McKinney, on the other hand, believes Simmons transferred him from the Light Rail Maintenance group to the North Side Facilities/Garage group because of his race and to "make room for some newly-hired white electricians." DSOF ¶15; Pl's Resp. DSOF ¶ 15. McKinney has presented some evidence that his transfer was not part of a normal rotation. According to McKinney, it is the practice at CTA that once an electrician selects a group in the annual pick, he cannot be moved to another group without his consent and he will not be sent on a rotation through other groups. McKinney Decl. ¶¶ 4, 8; *see also* Cedric Richardson Decl. [70-2] ¶¶ 4, 5; George Lewis Decl. [70-3] ¶¶ 5, 6. At the time of his transfer out of his pick in September 2018, McKinney had worked for CTA for over a year and had already rotated through various assignments during his first year on the job, including working on the Orange Line, Blue Line, and Red Line. McKinney Decl. ¶ 8. McKinney also claims that his move to a location far from his home was contrary to normal CTA practice. McKinney Decl. ¶ 7; Richardson Decl. ¶ 7; James McKinney III Decl. ¶ 5.[2]

---

[2]     The Court overrules CTA's objection to McKinney's, Cedric Richardson's, George Lewis's, and James McKinney's statements about the practices of the CTA with respect to its electricians on "lack of foundation" grounds. Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the

On October 15, 2018, McKinney tried to file a union grievance against Simmons regarding his transfer to the North Facilities/Garage group without his consent. McKinney Decl. ¶ 10; DSOF ¶ 3a; Doc. 65-2 at 9.  But according to McKinney, "the union replied that it would not support the grievance." McKinney Decl. ¶ 10.[3]  Four days later, Simmons informed McKinney that he would be moving back to the Light Rail Maintenance group. Doc. 65-2 at 9.  Thereafter, McKinney alleges Simmons began to retaliate against him by first taking away his CTA vehicle on October 22, 2018. DSOF ¶ 31; Pl's Resp. DSOF ¶ 31; Doc. 70-1 at 20; McKinney Decl. ¶ 11.[4]  At that time, all CTA electricians in the Light Rail Maintenance group were given CTA vehicles to drive to work locations, except McKinney, which was contrary to normal CTA practice. DSOF ¶ 31; Pl's Resp. DSOF ¶ 31; McKinney Decl. ¶¶ 11, 49.[5]  Without a CTA vehicle, McKinney was forced

affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602.  McKinney began working with the CTA as an electrician in July 2017 and avers that he has personal knowledge of the facts contained in his declaration. McKinney Decl. ¶ 1.  McKinney's statements are based on his own personal experience working at CTA as well as the declarations of Cedric Richardson, George Lewis, and James McKinney III (no relation to Plaintiff), who are long-term CTA electricians with years of experience working in different groups across CTA.  Richardson has been a CTA electrician since February 2007 and has worked in the South Facilities/Garages group, the North Facilities/Garages group, and the Light Maintenance Rail group. Richardson Decl. ¶ 2.  Lewis has been employed as a CTA electrician since May 1994, a foreman of the Subway group of electricians since June 2015, and worked previously in the Light Maintenance Rail group and the South Side Facilities/Garages group. Lewis Decl. ¶¶ 2, 3.  James McKinney has been employed by CTA as an electrician for twenty years and has worked in the South Facilities/Garages group and North Side Facilities/Garages group. James McKinney Decl. ¶ 3.  "Employment can provide the foundation for facts and perceptions relating to that employment." *Krnich v. FPC Corp.*, 2021 WL 3930306, at *3 (N.D. Ill. Sept. 2, 2021).  Based on their experiences, McKinney, Richardson, Lewis, and James McKinney "can testify about what they personally saw, heard, understood, and believed" regarding the practices of electricians at CTA. *Id.*

[3]     CTA objects that this statement lacks foundation and is based on speculation.  The Court finds McKinney's statement is not inadmissible for lack of foundation or because it is premised on speculation.  McKinney has personal knowledge of a union representative saying the union would not support his grievance against Simmons.

[4]     According to CTA, its vehicles are given to electricians based on availability. Doc. 64 at 25; DSOF ¶ 32.

[5]     CTA objects to McKinney's statement on "lack of foundation" grounds.  The Court overrules the objection because McKinney declaration expressly states that he relies on his personal knowledge based on his more than four years of experience working as an electrician at CTA. McKinney Decl., ¶¶ 1, 2.

to ride CTA trains to get to his work assignments carrying all of his tools and equipment with him. DSOF ¶ 31; Pl's Resp. DSOF ¶ 31; McKinney Decl., ¶ 11. On at least two occasions when he was without a CTA vehicle, Burnett directed McKinney to ride in the "cramped back area of a CTA vehicle, in an unsecured makeshift seat without a seat belt" while Burnett and another electrician, Gabe Hernandez, sat in the front seats. McKinney Decl. ¶¶ 13, 50.[6] Moreover, when McKinney returned to the Light Rail Maintenance group, Simmons took away McKinney's Red Line responsibilities and assigned him to the Blue Line, where he had to start and end work far from his home. *Id.* ¶ 12.

Upset with this treatment, on October 23, 2018, McKinney filed a formal written complaint with CTA's EEO department alleging race discrimination, among other things. McKinney Decl. ¶

---

McKinney may testify to his own personal observations based on his experience working for CTA. Moreover, Cedric Richardson states in his declaration that he has "never known a CTA electrician, other than Lasona McKinney, to not have a CTA vehicle to travel to work locations or to be required to ride CTA trains to travel to work locations." Richardson Decl. ¶¶ 2, 6. And George Lewis states in his declaration: "When CTA electricians have to travel to different locations to work they are provided with CTA vehicles in which to travel. This particularly has been the case for Joe Simmons's Light Maintenance Rail group since around 2003, when Joe Simmons took over [] and made sure that there were vehicles for all the electricians. Since around 2003[,] I have never known a CTA electrician, other than Lasona McKinney, to not have a CTA vehicle to travel to work locations or to be required to ride CTA trains to travel to work locations." Lewis Decl., ¶¶ 2, 3, 7. The Court overrules CTA's objections to these statements for lack of foundation. *See also* foreman Duffy McCann's Dep. [Doc. 705- at 6] at 32:2-9 ("Q: Have you ever had a CTA electrician who was not provided with a CTA vehicle to travel when he needs to travel to a different work location? A: No.").

[6]       CTA objects to Burnett's alleged statements to McKinney as inadmissible hearsay. If evidence is inadmissible hearsay, courts may not consider it at summary judgment. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021). McKinney can testify concerning the instruction Burnett gave to McKinney. Burnett's statements are commands, which are not hearsay. *United States Securities and Exchange Commission v. Berrettini*, 2015 WL 5159746, at *9 (N.D. Ill. Sept. 1, 2015) ("Instructions to an individual to do something are . . . not hearsay . . . because an order . . . is not capable of being true or false, and thus it is not offered for the truth of any matter asserted.") (internal quotes and citations omitted). Moreover, even if McKinney's account of Burnett's instruction was hearsay, it would likely be admissible under Rule 801(d)(2)(D) as a non-hearsay admission by a party opponent made by the party's agent. Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.").

15; Doc.70-1 at 18-20.[7] In his internal EEO complaint, McKinney alleged that he experienced race discrimination when Simmons removed him from his Light Rail Maintenance group pick and transferred him to the North Facilities/Garages group and then, took away his Red Line responsibilities and CTA vehicle when he returned to light rail maintenance duty. Doc. 70-1 at 20. McKinney's EEO complaint stated in part: "I feel that Mr. Simmons discriminated against me because I am black." *Id*.

McKinney asserts that after he filed the internal EEO complaint of race discrimination, Simmons and his coworkers pursued a campaign of retaliation and harassment against him, with Simmons being the primary instigator of the retaliatory harassment. McKinney Decl. ¶¶ 3, 17.[8] The alleged harassment began with the following incidents: (1) in October 2018, McKinney was not allowed to attend a CTA management safety meeting with his co-workers;[9] (2) on November 10 and 11, 2018, electricians Robert Schak and Joe Simmons, Jr. (foreman Simmons's son) gave

---

[7]     The parties seem to dispute when McKinney actually filed this written EEO complaint of race discrimination with CTA. A CTA exhibit suggests that CTA did not receive McKinney's EEO complaint until April 9, 2019. DSOF ¶¶ 3(b), 3(f); Pl's Resp. DSOF ¶ 3b; Doc. 65-2 at 5-11. For purposes of the instant motion, the Court accepts McKinney's version that CTA received the written EEO complaint on October 23, 2018.

[8]     CTA objects to McKinney's statement that after he filed his internal EEO complaint with CTA, he was subject to a continuing course of harassment, arguing that it contains a legal conclusion. Whether, as a legal matter, the conduct McKinney describes is in fact actionable retaliatory harassment under Title VII is a legal conclusion which the Court does not accept as dispositive. However, that McKinney felt he was harassed in retaliation for his complaint is not a legal conclusion. *Bailey v. Canan*, 82 F.Supp.2d 966, 976 n.12 (S.D. Ind. 2000).

[9]     CTA argues that McKinney's assertion that he was not allowed to attend a safety meeting in October 2018 contradicts his deposition testimony admitting that he was working with contractors that day and Simmons informed him that a CTA manager would speak with him individually about the new safety measures. "As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Hickey v. Protective Life Corp.*, 988 F.3d 380, 389 (7th Cir. 2021). But McKinney's declaration does not contradict his deposition. McKinney explained at his deposition that it was not important that he stay with the contractors that day and he "could have went to the meeting if [he] was invited." McKinney Dep. at 209:24-210:3. Therefore, the Court can consider both McKinney's testimony and declaration.

McKinney light fixtures with the stems cut short and the wiring exposed to create a spark; and (3) on November 11, 2018, Schak forced McKinney to stand over vomit at a CTA platform, an assignment not within the normal job responsibilities of a CTA electrician. McKinney Decl. ¶ 17.

The following day, on November 12, 2018, after hearing Schak yell at McKinney, Hernandez told McKinney: "[A]ll of this could stop and I could go back to how things were with my CTA vehicle and Red Line responsibility if I would stop making waves." McKinney Decl. ¶ 18. Further, a month later on December 12, 2018, Hernandez and Burnett both told McKinney that "everyone knew that Joe Simmons was targeting me because I am black and had fought against giving up my picked spot to white electrician Michael Crudele" and that "I should apologize and be sent back to the Red Line and get my CTA vehicle back." *Id.* McKinney also claims that on February 14, 2019, Burnett told him that Simmons was "targeting" him in order to get him fired or to get him to pick out of the Light Maintenance Rail group. *Id.*[10]

Later that same month, on February 27, 2019, McKinney discovered a toy rat placed immediately next to a computer he was set to use to enter his time records in the Midway Rail Station electrical switchgear room. McKinney Decl. ¶ 19; Doc. 65-2 at 266-74. McKinney states that the "rat was almost certainly placed there by Gabe Hernandez, who was the last person in the

---

[10]     CTA contends that the alleged statements by Hernandez and Burnett are inadmissible hearsay. CTA's hearsay objection is overruled. "To the extent those statements are offered as examples of harassing comments made to [McKinney] rather than for their truth, they are not hearsay" because they are being used only to prove that the prior statements had been made. *Vovillia v. Illinois Dep't of Hum. Servs.,* 2019 WL 2994533, at *6 (N.D. Ill. July 9, 2019). Moreover, to the extent Hernandez's and Burnett's statements are offered for their truth, they are statements of their then-existing motive, intent, or plan and are not excluded by the hearsay rule. *Id*; *Flanagan v. Office of Chief Judge of Circuit Court of Cook County, Ill.*, 893 F.3d 372, 375 (7th Cir. 2018) ("[S]tatements of a declarant's state of mind (motive, intent, or plan) are not excluded under the hearsay rule."); *Alvares v. Bd. of Ed. of City of Chicago*, 2021 WL 1853220, at *4 (N.D. Ill. May 10, 2021). Finally, Burnett's statements as a stand-in foreman, speaking within the scope of his employment, would arguably be admissible at trial as an admission of a party opponent and are not hearsay. Fed. R. Evid. 801(d)(2)(D); *Alvares*, 2021 WL 1853220, at *4.

room before I discovered the rat and who remained logged in on the computer when I came to it."
McKinney Decl. ¶ 19.[11] McKinney understood the toy rat to be an attempt to intimidate him and
get him to "[s]top talking" and "[s]top being a rat." McKinney's Dep. at 207:21-24, 328:2-6;
McKinney Decl. ¶ 19.[12] The day after discovering the toy rat, McKinney notified CTA of the
incident by filing an Unusual Occurrence Report ("UOR"), which stated in part: "I believe and
please note this is a clear example of job harassment." McKinney Decl. ¶ 20; Doc. 70-1 at 22;
DSOF ¶ 3c; Pl's Resp. DSOF ¶ 3c. McKinney attempted to give the UOR to Simmons, but
"Simmons refused to take it electronically and when [McKinney] gave it to him by hand, Simmons
threw it away." McKinney Decl. ¶ 20. McKinney then gave the report to CTA management. *Id.*

---

[11] CTA objects to McKinney's assertion about Hernandez on the basis that it constitutes speculation and lacks foundational support. Speculation cannot defeat summary judgment, *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021), but McKinney can testify based on his personal knowledge. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602. In support of this assertion, McKinney relies on his personal knowledge that the toy rat was found in a workspace shared by Hernandez and Burnett in the Midway switch gear/electricians' break room, the rat was customarily kept in Hernandez's area at the back of the break room, McKinney and Hernandez were the only two people that entered the room at that time, Hernandez was the last person in the room before McKinney discovered the rat, Hernandez had recently used the computer right next to where the toy rat was discovered, and Hernandez remained logged in on the computer right next to the toy rat when McKinney discovered the rat. DSOF ¶ 40; Pl's Resp. DSOF ¶ 40; McKinney Decl., ¶ 19; Doc. 65-2 at 266-74. As an additional basis for his statement, McKinney has provided a photo showing the toy rat next to the computer screen and Hernandez still logged into the computer. Doc. 65-2 at 270. This is sufficient admissible circumstantial evidence for a reasonable jury to infer it was Hernandez who left the rat right next to the computer McKinney was set to use to enter his time. *United States v. Proano*, 912 F.3d 431, 441 (7th Cir. 2019) ("Personal knowledge can include reasonable inferences draw from a witness's observations and firsthand experiences"). CTA would certainly be free to cross-examine McKinney on this issue, but McKinney can testify about his first-hand personal experience.

[12] CTA objects to these statements as speculative and as being an improper legal conclusion. The statements are not speculative as to what McKinney believed. Moreover, McKinney's interpretation of the toy rat is reasonable. A rat carries a pejorative connotation, meaning "a contemptible person: such as one who betrays or deserts friends or associates" or an "informer." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/rat (last visited June 8, 2022); *Lorenzo v. Seeley*, 2008 WL 939623, at *10 (D. N.J. April 7, 2008). Because the Court views the statements objected to as showing McKinney's understanding about what the person who left the rat intended, rather than a legal conclusion, and that interpretation is reasonable, the Court overrules CTA's objection.

There is no evidence that CTA investigated McKinney's UOR or took any action in response to his report. *Id*. ¶ 21.

McKinney asserts that after he reported the rat incident, the harassing, retaliatory conduct towards him continued: (1) on February 28, 2019, Simmons's brother, Mark Simmons, "stalked" McKinney, driving to each of McKinney's work sites and watching him;[13] (2) on March 5, 2019, McKinney's CTA service vehicle was again taken away from him and not returned until August 2019, when he picked away from Simmons's supervision and into Duffy McCann's group;[14] (3) on March 5, 2019, McKinney was assigned to work alone in an isolated and elevated area in the O'Hare fan room, a job where an electrician would normally have assistance for safety reasons, and Burnett told him that no one would help him with the job; (4) on March 12, April 1, and April 3, 2019, coworker Mark Allen, stand-in foreman Burnett, and coworker Mark Nalor, respectively, refused to assist him at work and told him that Simmons had instructed them not help him;[15] (5)

---

[13]    CTA objects to this allegation regarding Mark Simmons as hearsay and speculative. This is not a hearsay situation because the allegation contains no statement other than that of the declarant. *See* Fed R. Evid. 801(c). However, McKinney's declaration fails to support a reasonable inference that Mark Simmons was actually "stalking" him. McKinney's statement does reflect his personal observation that he saw Mark Simmons at each of his work sites and parked where he could watch him on February 28, 2019. *See* DSOF ¶¶ 42, 43; Pl's Resp. DSOF ¶¶ 42, 43. The Court will consider McKinney's statement for that limited purpose.

[14]    CTA argues that McKinney's statement that his CTA service vehicle was taken away after he reported the rat incident should be disregarded because it is speculation and a legal conclusion. The statement is admissible. McKinney has personal knowledge of the fact asserted, and he states a fact, not a legal conclusion. *Green v. Westfield Ins. Co.*, 963 F.3d 619, 627 (7th Cir. 2020); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

[15]    CTA objects to these statements as inadmissible hearsay. There are two layers of out-of-court statements at issue. First, Simmons's instruction to Allen, Burnett, and Nalor that they could not help McKinney in carrying out work assignments is not hearsay. As a foreman at CTA, Simmons is considered a party-opponent and his statements would qualify as admissions by a party opponent under Fed. R. Evid. 801(d)(2)(D). In addition,"[c]ommands are not statements submitted for their truth and so are not hearsay." *Flanagan*, 893 F.3d at 375. What Simmons said to Allen, Burnett, and Nalor was a command: you may not help McKinney. *Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017). Second, Allen's, Burnett's, and Nalor's statements to McKinney are admissible as "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). Third, Burnett's statement to McKinney

on April 1, 2019, the same day Burnett told McKinney he had been instructed by Simmons not to help him, Burnett told McKinney that he had been appointed to be his personal foreman and they were going to "eradicate the problem";[16] and (6) on many occasions in March and April, 2019 and thereafter, McKinney sent Simmons text messages asking about job assignments and/or work locations, and Simmons did not respond. McKinney Decl. ¶¶ 22-27; DSOF ¶¶ 45-47, 74-75; Pl's Resp. DSOF ¶¶ 45-47, 74-75. As another example of retaliation, McKinney alleges that Hernandez and others clocked in for projects on which McKinney did the majority of the work. DSOF ¶ 45; Pl's Resp. DSOF ¶ 45.

McKinney complained about the situation to CTA, but "CTA took no actions in response." McKinney Decl. ¶ 29. On March 4, 2019, McKinney filed an UOR reporting "perceived harassment in the workplace." DSOF ¶ 3d; Pl's Resp. DSOF ¶ 3d. On March 27, 2019, McKinney spoke with CTA Senior Manager Jeannine Messina "regarding his concerns about his experience working as an electrician for the CTA." DSOF ¶ 3e; Pl's Resp. DSOF ¶ 3e. In addition to these complaints, on April 9, 2019, McKinney met with Van Johnson, CTA's Senior Coordinator of EEO Programs, to report "this on-going course of harassment," including the rat incident. McKinney Decl. ¶ 28. McKinney offered to provide Johnson with a flash drive containing photos substantiating his claims, but Johnson told him that he did not need it and refused to take it. *Id.*

---

would also likely qualify as an admission by a party-opponent. Fed. R. Evid. 801(d)(2)(D). Finally, to the extent the statements by Allen, Burnett, and Nalor are offered as examples of harassing comments made to McKinney rather than for their truth, they are not hearsay. *Vovillia,* 2019 WL 2994533, at *6.

[16] CTA asserts that Burnett's statement is inadmissible hearsay. What Burnett told McKinney is not hearsay. Burnett serves as a stand-in foreman for the Light Rail Maintenance group when Simmons is absent, and his statement would likely qualify as an admission of a party opponent which is not hearsay. Fed. R. Evid. 801(d)(2)(D).

Johnson also told McKinney that he had already provided plenty of evidence. *Id.*[17] On April 30,

2019, Johnson sent McKinney a letter stating in part:

> Our office received your written complaint on April 9, 2019. You alleged that
> Joseph Simmons (Foreman B Electricians) assigned you an unfair work schedule
> since September 2018, and has not given you an assigned CTA vehicle. You further
> alleged Robert Schak (B Electricians) did not properly prep your work assignments
> in November 2018.
>
> Based on the information you provided, these matters do not involve a potential
> violation of CTA's policies prohibiting harassment, discrimination, bullying, or
> retaliation found in Administrative Procedure #1601. Nonetheless, we took your
> concerns seriously and have made management aware of the allegations raised so
> that they may address them accordingly. Your complaint will be referred to
> Jeannine Messina (Senior Manager, Administration – Infrastructure) for additional
> review and/or follow-up.

Doc. 65-2 at 5-6. There is no evidence that CTA took any corrective actions in response to

McKinney's complaints. McKinney Decl., ¶ 29.

McKinney contends the harassment and retaliation continued even after he met with

Johnson. In particular, on or about April 9, 2019, Simmons assigned McKinney to crush

approximately one thousand mercury-filled fluorescent lamps. McKinney says a job of that size

would not normally be assigned to an electrician to do alone. McKinney Decl., ¶ 30; DSOF ¶¶ 66-

70; Pl's Resp. DSOF ¶¶ 66-70. [18] Further, on May 22, 2019, McKinney was not allowed to

participate in a tour of the new 95th street station with his coworkers. McKinney Decl. ¶ 31.

---

[17]    CTA objects to Johnson's statements as hearsay, but they qualify as a nonhearsay admission of a
party opponent. Fed. R. Evid. 801(d)(2)(D).

[18]    CTA argues that McKinney's statement lacks foundation. The Court rejects this argument because
McKinney may testify about the normal job duties of other electricians based on his more than four years
of experience working at CTA as an electrician and his personal knowledge of the work of other CTA
electricians *See United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) ("[P]ersonal knowledge includes
opinions and inferences grounded in observations or other first-hand experiences.").

Following these events, on June 14, 2019, McKinney filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). McKinney Decl. ¶ 32; Doc. 65-2 at 2-3. McKinney checked the boxes saying he had been discriminated against based on race and retaliation. *Id.* Less than two weeks later, on June 27, 2019, McKinney met with CTA administrators Messina and Leonardo Romano and described the incidents that he felt were harassing. McKinney Decl., ¶ 34; DSOF ¶ 3e; Pl's Resp. DSOF ¶ 3e. CTA has not shown that it did anything in response to McKinney's complaint to Messina and Romano about harassing behavior.

After filing the EEOC charge, McKinney faced continued harassment. McKinney Decl. ¶ 35.[19] McKinney alleges there have been five or more instances where he was excluded from work meetings in retaliation for complaining of race discrimination. DSOF ¶ 52; Pl's Resp. DSOF ¶ 52. For example, on July 10 and July 22, 2019, McKinney was excluded from important job training opportunities with his coworkers. McKinney Decl., ¶ 35; DSOF ¶¶ 53-55; Pl's Resp. DSOF ¶¶ 53-55.[20] McKinney further contends that his computer access and ability to view his co-workers' timesheets was thereafter limited so he can no longer determine which training, meetings,

---

[19] CTA objects to McKinney's characterization of the behavior as "harassment" as a legal conclusion. Whether the described conduct is in fact actionable harassment is a legal conclusion, but McKinney's belief that he was harassed is not a legal conclusion. *Bailey*, 82 F.Supp.2d at 976 n.12.

[20] CTA challenges McKinney's statement, asserting that it contradicts his deposition testimony stating that Mark Allen also did not attend the July 10, 2019 meeting. Contrary to CTA's assertion, McKinney's declaration statement is not necessarily inconsistent with his deposition testimony so the Court will not disregard it. McKinney could have been excluded from a meeting with coworkers in retaliation for his previous race discrimination complaints without all co-workers attending the meeting. In fact, McKinney testified that after he notified CTA that he was not being allowed to go to training and meetings, Simmons "would sometimes leave one guy out with me so that it would be more than just [McKinney]" excluded, but McKinney was the only one "constant[ly] excluded." McKinney Dep. at 355:11-19. McKinney believed that Mark Allen's exclusion from the July 10, 2019 meeting was intended "to make it look good." *Id.* at 356:21-357:1.

overtime, and jobs he is being excluded from. McKinney Decl., ¶ 35.[21]  McKinney describes further incidents of retaliatory harassment: (1) on many occasions, Simmons ignored McKinney's texts asking if Simmons was in and if not, who was serving as acting foreman that day and (2) on a number of occasions, Simmons and Burnett lied to McKinney about whether they were at work, which resulted in McKinney not knowing who his foreman was on a daily basis. *Id*. ¶ 36.[22]  When McKinney picked into McCann's group on August 5, 2019, some of his complaints regarding his work environment were resolved. DSOF ¶ 76; Pl's Resp. DSOF ¶ 76.  For instance, McKinney was given access to a CTA van, he was able to start and quit at a more convenient work site, and he began being included in more training and meeting sessions. DSOF ¶¶ 77-79; Pl's Resp. DSOF ¶¶ 77-79.

McKinney, however, points to other incidents of harassment that occurred after August 5, 2019.  The first incident involved foremen McCann and Simmons not giving McKinney necessary work keys, including keys to CTA's bathrooms and a caged areas where tools, water, protective equipment, and other materials are stored. McKinney Decl., ¶ 39; DSOF ¶¶ 56-59; Pl's Resp. DSOF ¶¶ 56-59.  McKinney requested the missing keys from McCann on multiple occasions and was told by McCann that he was unable to get him the requested keys. *Id*.[23]  McKinney then contacted CTA Administrator Dan Georges via email on September 24, 2019 requesting assistance with the key situation. McKinney Decl., ¶ 39; DSOF ¶¶ 57-58; Pl's Resp. DSOF ¶¶ 57-58.  After

---

[21]    McKinney has withdrawn his allegation that he was denied overtime because of his race and in retaliation for his complaint of race discrimination. DSOF ¶ 8; Pl's Resp. DSOF ¶ 8.

[22]    The Court rejects CTA's assertion that Simmons's and Burnett's statements are inadmissible hearsay.  Their statements are admissions by agents of a party opponent and not hearsay. Fed. R. Evid. 801(d)(2)(D).

[23]    Contrary to CTA's objection, McCann's alleged statement is not inadmissible hearsay but is an admission by a party-opponent.

looking into the situation, Georges gave McKinney the missing keys. *Id*.[24] When McKinney moved back into Simmons's group in early 2021, he was again denied keys that his co-workers had. McKinney Decl., ¶ 39. McKinney reported the missing keys to Simmons and Burnett, but they ignored most of his requests for the missing keys. *Id*. ¶¶ 39, 52.[25]

McKinney contends that he experienced the most serious incident of harassment on July 16, 2020. McKinney Decl. ¶ 37. On that day, foreman McCann assigned McKinney to inspect "stingers" and other electrical equipment along the walls of the 54th Street rail station. *Id*. McKinney describes the 54th Street rail station as a "huge, cavernous building with only a few employees typically present." *Id*. McKinney alleges that along the east wall and right next to an electrical "stinger" and test box he was sent to inspect, he found a rope hanging fashioned into a noose. *Id*; DSOF ¶ 49; Pl's Resp. DSOF ¶ 49.[26] Upon seeing the noose, McKinney suffered a panic attack, which left him gasping for breath and dazed. McKinney's Decl., ¶ 37. McKinney states that he is still upset and anxious to this day by the discovery of the noose. *Id*.[27] McKinney did not report the noose to anyone at CTA until March 1, 2021, more than seven months later, because CTA representatives' previous non-responsiveness to his complaints made him believe

---

[24] This sentence is not hearsay as contended by CTA because it contains no statement by Georges. Fed. R. Evid. 801(d).

[25] Again, this statement is not hearsay because it contains no assertion other than that of the declarant. *See* Fed. R. Evid. 801(d).

[26] McKinney attached a photo showing the noose and where it was placed to his declaration. McKinney's Decl. ¶ 37; Doc. 70-1 at 23.

[27] CTA claims that McKinney's statement that he is still upset and anxious about the noose incident contradicts his deposition testimony because he testified at his deposition that he has had only two panic attacks at work: (1) when he was stuck in an elevator and (2) when he discovered the noose. McKinney Dep. at 36:20-37:7. But regarding the noose, McKinney's declaration states exactly that: "Upon seeing this noose, I suffered a panic attack." McKinney Decl. ¶ 37. His declaration contains no statement about suffering more than two panic attacks at work. And McKinney's deposition testimony CTA cites contains no statements about whether he is still upset and anxious about finding the noose. There does not appear to be any contradiction.

that "they were not on my side, that it wouldn't do any good, and that they wouldn't take any action in response." DSOF ¶ 3e, 51; Pl's Resp. DSOF ¶ 3e, 51; McKinney Decl., ¶ 38; Doc. 65-2 at 141-43.[28]

Following the noose incident, the retaliatory harassment continued. On September 21, 2020, McKinney was assigned to work alone on a high voltage "stingers" job. McKinney Decl. ¶ 40. According to McKinney, this job is customarily done in pairs for safety reasons. *Id*.[29] On October 13, 2020, McKinney filed this lawsuit, alleging because of his race and in retaliation for his complaints of race discrimination, he was "subject to a campaign of harassment." Doc. 1, ¶ 10. He alleged that he "complained of this harassment to CTA management and to the CTA EEO department but the CTA took no action in response." *Id*. ¶ 11.[30]

---

[28]     CTA characterizes this statement as contrary to McKinney's prior deposition testimony where "he explains that he did not tell anybody at the CTA (p. 84) and nobody at the CTA found out about it from July 2019 until October 2020 (p. 94)." Doc. 75-1 at 7. The Court's review reveals no inconsistency. In his deposition, McKinney testified that he did not notify anyone at the CTA about the noose on July 16, 2020, the day he discovered the noose (84:3-12), that CTA did know about the noose incident between July 2019 and October 2020 when he filed his original complaint (94:3-23), and he reported the noose to CTA on March 1, 2021 (88:6-23). In his declaration, McKinney explains why he delayed in reporting the noose incident to CTA. CTA's objection is overruled.

[29]     CTA objects that McKinney's statement that it is the normal practice for electricians to work in pairs on high voltage "stingers" for safety reasons is without foundation. Given McKinney's experience as a CTA electrician, it is reasonable that he would have knowledge of the customary practice for high voltage "stingers" jobs during his tenure. McKinney's statement is also supported by the declarations of Richardson and Lewis, which are based on their extensive personal experience working as CTA electricians. *See* Richardson Decl. ¶ 8 ("I am familiar with the job of installing or replacing 'stingers.' Stingers are an electrical rod carrying 600 volts of electricity that we use to touch the train because there is no third rail track—we touch the train with a stinger in order for the train to move. It is the custom and practice at the CTA that installing stingers is a two-person job. It is too dangerous to do alone, because with 600 volts if there is an accident [and] you are doing it alone[,] there is no one there to help you out or to cut off the power."); Lewis Decl. ¶ 9 (same).

[30]     In his second amended complaint, filed on March 16, 2021, McKinney claims, among other things, that a noose was left at his place of work. Doc. 32, ¶ 10. McKinney did not include the noose incident in the initial two complaints he filed in this lawsuit. DSOF ¶ 7; Pl's Resp. DSOF ¶ 7.

McKinney believes another retaliatory incident occurred in February 2021 when fellow electricians moved their cars to another parking lot away from where McKinney parked, physically separating themselves from him. McKinney Decl. ¶ 41. McKinney also alleges that throughout the entirety of his employment at CTA, he has not been given tools, tool bags, radio lunch boxes and personal protective equipment that were given to white electricians, including Crudele, Joe Simmons, Jr., Nalor, and Tom Jana. McKinney Decl. ¶ 42; DSOF ¶¶ 60-63; Pl's Resp. DSOF ¶¶ 60-63. McKinney's current CTA vehicle has fewer tools than the van his coworkers drive and he was only given a CTA-required harness after he testified at his deposition than one had not been provided. McKinney Decl. ¶ 42. McKinney has asked Simmons and Burnett for tools that his coworkers have and has not been given them. *Id*. ¶ 51.[31] In addition, every one of the electricians in McKinney's group has been given the opportunity to serve as acting foreman except him. *Id*. ¶ 43.

On March 1, 2021, McKinney filed a written EEO complaint with CTA about the July 16, 2020 noose incident. DSOF ¶ 3i; Pl's Resp. DSOF ¶ 3i; Doc. 65-2 at 141-43. CTA has not shown that it investigated McKinney's complaint about the noose. Another allegedly retaliatory incident occurred on April 4, 2021, when Burnett falsely accused McKinney of being AWOL when he was on a pre-approved vacation day that McKinney had notified him about and Burnett had confirmed weeks earlier. Doc. 65-2 at 147. On May 24, 2021, McKinney filed another written EEO complaint with CTA alleging that he had been "consistently retaliated against by CTA management," including foreman Simmons, foreman McCann, and acting foreman Burnett and describing, among other things, the July 2020 noose incident, the April 2021 threat of disciplinary action for

---

[31] CTA objects to this statement as hearsay. Because there is no statement made by another person, there is no hearsay.

a false accusation of being AWOL, and Simmons failing to inform McKinney when he is working and denying him the same keys and tools as his coworkers since January 2020. DSOF ¶ 3j; Pl's Resp. DSOF ¶ 3j; Doc. 65-2 at 145-47.  There is no evidence CTA took any action in response to McKinney's May 2021 complaint.  At some point in 2021, not specified in the record, McKinney sought and received psychological counseling for the anxiety and depression caused by his treatment at CTA. McKinney Decl. ¶ 44.  Finally, on January 27, 2022, McKinney was required to file an UOR to account for vacation days he had properly requested off. *Id.*  McKinney suffered a panic attack and the day after this event, broke down crying, was unable to go to work, and was forced to drive back home. *Id.*[32]

## DISCUSSION

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

McKinney asserts claims for racial harassment and retaliatory harassment under Title VII. Doc. 32, ¶ 16.  CTA seeks summary judgment on all claims asserted in McKinney's Second

---

[32]     CTA argues that McKinney's statement cannot be considered because "this area was not disclosed in his deposition." Doc. 75-1 at 8.  CTA's objection is overruled.  At his depositions on June 1 and July 7, 2021, McKinney could not have described an event that occurred after his depositions.

Amended Complaint. The Court first addresses the merits of McKinney's retaliatory harassment claim under Title VII and then his claim of racial harassment under Title VII.[33]

## I.      Retaliation Claim Based on Hostile Work Environment

McKinney alleges that CTA retaliated against him for reporting race discrimination, and his retaliation claim is based on the creation of a hostile work environment. "Title VII prohibits an employer from retaliating against an employee for opposing . . . an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citing 42 U.S.C. § 2000e-3(a)). The Seventh Circuit has made it clear that the "creation of a hostile work environment can be a form of retaliation." *Smith v. Northeastern Illinois University*, 388 F.3d 559, 567 n.5 (7th Cir. 2004); s*ee Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("This is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint . . . . No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment.").

To survive summary judgment in the retaliation context, an employee must provide evidence that would lead a reasonable jury to find: "(1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). Ultimately, considering the evidence as a whole, the Court conducts a "straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?" *Abrego v. Wilkie* 907 F.3d 1004, 1014 (7th Cir. 2018) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556,

---

[33]      CTA also seeks summary judgment on McKinney's purported race-based disparate treatment claim, but for reasons discussed below in footnote 42, consideration of the merits of this argument is unnecessary.

563 (7th Cir. 2016)). If McKinney has enough evidence to show a retaliatory hostile work environment, he must also establish a basis for employer liability. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

McKinney argues that he engaged in statutorily-protected activity by filing a written EEO complaint of race discrimination with CTA in October 2018, orally complaining to Johnson, Messina, and Romano at CTA about retaliatory harassment in April 2019 and June 2019, and filing an EEOC charge complaining of race discrimination and retaliation in June 2019. CTA does not dispute that McKinney engaged in statutorily-protected activity. Rather, CTA seeks summary judgment on McKinney's retaliation-by-hostile work environment claim on four main grounds. First, CTA argues that McKinney's claim is barred because he did not include it in his EEOC charge. Second, CTA argues that it is entitled to summary judgment on McKinney's retaliation claim because he did not suffer any adverse employment action. Third, CTA insists that even assuming that an adverse action is supported by the record, McKinney cannot establish a causal link between his protected activity and any alleged adverse action. Finally, CTA argues that the evidence does not support a basis for employer liability in this case. The Court finds that McKinney has produced sufficient evidence to create a genuine issue of material fact that CTA had a retaliatory hostile work environment and that there is a basis for CTA liability.

### A. Exhaustion

As a threshold matter, CTA argues that several of the alleged incidents have not been administratively exhausted and cannot serve as a basis to support McKinney's retaliatory harassment claim. Specifically, CTA asserts that the Court may not consider the following incidents of alleged retaliation because McKinney did not include them in particular in his EEOC charge: (1) he was excluded from work meetings; (2) he was deprived of necessary keys and tools;

19

(3) his CTA vehicle was taken away from him; (4) he was forced to ride in a cramped space in the back of a vehicle; (5) a toy rat was left in his work space; (6) he was subjected to personal surveillance by Mark Simmons; (7) co-workers failed to perform work when they had to do jobs together; (8) a noose was left at his workplace; and (9) he was given unsafe work assignments.

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). However, EEOC charges completed by laypersons need not include "each and every fact that combines to form the basis of each claim in [the] complaint." *Id*.  Instead, the relevant question is whether claims are "like or reasonably related," meaning (1) there is "a reasonable relationship between the allegations in the charge and the claims in the complaint" and (2) "the claim in the complaint can be reasonably expected to grow out of an EEOC investigation of the allegations in the charge." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).  To be like or reasonably related, "[t]he relevant claim and the EEOC charge must, at a minimum, describe the same conduct and implicate the same individuals." *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 831-32 (7th Cir. 2015).  The test for determining "whether an EEOC charge encompasses the claims in a complaint . . . grants the Title VII plaintiff significant leeway." *Cheek*, 31 F.3d at 500; *Huri*, 804 F.3d at 831 ("Courts review the scope of an EEOC charge liberally.").

The Court finds that the above examples of retaliatory harassment are not beyond the scope of McKinney's EEOC charge.  In his EEOC charge, McKinney checked the boxes for race discrimination and retaliation.  He alleged that he was hired in July 2017; he was a B-Electrician; he was "subjected to different terms and conditions of employment, including, but not limited to, being transferred to a different worksite and denied overtime"; he complained to CTA about the

alleged race discrimination; and subsequently, he was "harassed." Doc. 65-2 at 2. He listed "10-01-2018" as the date of the earliest act of discrimination and "06-14-2019" as the date of the latest act of discrimination but also checked the box for "continuing action." *Id*. McKinney did not have a lawyer and was not assisted by a lawyer when filing his EEOC charge. McKinney Decl. ¶ 32.[34] In his current complaint in this case, McKinney alleges:

> Because of his race and in retaliation for his complaint of race discrimination, [he] was subject to a campaign of harassment: his CTA vehicle was taken away from him, so he was the only electrician from his foreman's two groups forced to travel on CTA trains with his tools and equipment during his work day; he was made to ride in a cramped space in the back of a vehicle; a co-worker left a toy rat in his work space; he was subject to personal surveillance; co-workers refused to perform work when they had to do jobs together; a noose was left at his place of work; he was excluded from work meetings; necessary keys were withheld from him; tools and personal protective equipment were not given to him that were given to junior white electricians; and he was given unsafe work assignments.

Doc. 32, ¶ 10.

Exhaustion is not an issue here because McKinney alleged retaliatory harassment in his EEOC charge. *Huri*, 804 F.3d. at 832 (EEOC charge broadly alleging that plaintiff had "been subjected to harassment because of [her] religion and national origin" preserved the plaintiff's hostile work environment claim on the basis of her religion and national origin); *Nolan v. City of Chicago*, 2017 WL 569154, at *5 (N.D. Ill. Feb. 13, 2017) (plaintiff's general "harassment allegations [in his EEOC charge] preserved a freestanding claim that he was subject to a hostile work environment."). In any event, the retaliatory harassment allegation in McKinney's EEOC charge is sufficient to satisfy the "like or reasonably related" standard for purposes of his retaliation claim. CTA argues that McKinney impermissibly seeks to "tack on additional claims" in this lawsuit that were not included in his EEOC charge. Doc. 64 at 2. But the incidents set forth in

---

[34] McKinney states that he attempted to notify the EEOC of the noose incident but its "portal would not accept an upload of the video [he] had of the noose and the EEOC investigator failed to respond to [his] requests for help." McKinney Decl. ¶ 38.

paragraph 10 of McKinney's second amended complaint are not separate claims. Rather, they are facts in support of McKinney's retaliatory hostile work environment claim, which has been exhausted. The conduct described in the complaint is all part of the single, continuing wrong that McKinney alleged in his EEOC charge. McKinney's EEOC charge specifically alleges retaliation and that he was "harassed" subsequent to complaining about race discrimination. Except for the noose incident discussed in Part II below, McKinney is not arguing that any of the incidents detailed in his complaint on their own amount to independently actionable adverse employment actions. Instead, they are all part of a "campaign" of retaliatory harassment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"); *Pruitt v. City of Chicago, Illinois*, 472 F.3d 925, 929 (7th Cir. 2006) ("a hostile environment is a single wrong.").

Nor does McKinney's complaint add a different theory of retaliation than the type brought to the EEOC or challenge a different discrete act of retaliation than alleged in the EEOC charge as retaliatory. *Cf. Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (holding failure-to-promote claim not raised in EEOC charges was barred because "the general rule [is] that each separate act of discrimination must be set out in an EEOC charge before an action can be brought."); *Vela v. Vill. of Sauk Vill.,* 218 F.3d 661, 664 (7th Cir. 2000) (sexual harassment claim in lawsuit "wholly diverse from the claim of disparate treatment [on the basis of sex] described in her EEOC charge."). This also distinguishes the cases cited by CTA. *See Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 920 (7th Cir. 2000) ("employer's decision to terminate a worker is a separate and distinct act from a subsequent decision not to rehire that employee" and thus not "reasonably related"); *Cheek,* 31 F.3d at 503 ("When an EEOC charge alleges a particular theory

22

of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge."); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111-12 (7th Cir. 1992) (charge that only specifically referenced plaintiff's termination and then included a general allegation of race discrimination did not properly present a claim of racial harassment to the EEOC).[35] Again, McKinney's Second Amended Complaint does not bring additional retaliation claims that were not included in his EEOC charge, but includes facts to support his original retaliatory harassment claim. *Macias v. Bakersfield Restaurant, LLC*, 54 F.Supp.3d 922, 928 (N.D. Ill. 2014).

It is clear from the face of the EEOC charge that McKinney was bringing a Title VII retaliation claim based on harassment, as opposed to one based on a more discrete adverse employment action. The EEOC charge specifically references McKinney having "been harassed" and those words can be construed to imply a hostile work environment claim. *Huri*, 804 F.3d at 832 ("In the context of Title VII cases, the word 'harassment' frequently describes the phrase 'hostile work environment.'"); *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003) ("Harassment . . . is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive work environment."); *Nolan*, 2017 WL 569154, at *5 (charge stating that plaintiff was "continually harassed" after describing when he was hired and his position "preserve[d] the freestanding claim that a hostile work environment existed."). McKinney's EEOC charge implicates the same

---

[35] Further distinguishing the situation here from the *Rush* case is the fact that McKinney did not have an attorney at the time of his EEOC charge. *Rush*, 966 F.2d at 1112 (holding because plaintiff "was advised by her attorney even at the stage of filing her charge with the EEOC[,] . . . it was not unreasonable to require some additional specificity or detail as a condition precedent for permitting her to assert her claim of racial harassment.").

individual (Joe Simmons) and behavior (retaliatory harassment) pertinent to this suit. *Huri*, 804 F.3d at 832. CTA was thus put on notice about the nature of McKinney's retaliation claim— harassment. *Huri*, 804 F.3d at 832 (because plaintiff included nationality and religion based harassment in her EEOC charge, "her employers had no reason to be surprised by her Title VII hostile work environment allegations" covering the same time period, which implicated the same individuals and behavior pertinent to the lawsuit); *Cheek*, 31 F.3d at 500. Although McKinney did not list the specific harassing conduct in his charge and he could have been more detailed, he was not required to list every instance of retaliatory harassing conduct he experienced. *Cheek*, 31 F.3d at 500; *Urban v. Blossom Hill Health Centre, Inc.*, 2000 WL 1262937, at *8 (N.D. Ill. Sept. 1, 2000) (holding plaintiff's allegations were not outside the scope of her discrimination charge even though plaintiff's "charge did not include each instance of harassment she now alleges"). Because McKinney's complaint simply describes specific examples of alleged retaliatory harassment, it is reasonably related to his EEOC charge discussing retaliation based on harassment.

The Court also concludes that the allegations contained in paragraph 10 of his Second Amended Complaint reasonably could be expected to grow out of an EEOC inquiry into his more general charge of retaliation for having reported the alleged race discrimination in the form of harassment. The general allegation of retaliatory harassment fairly encompasses the specific allegations to which CTA objects, all of which relate to the harassment McKinney experienced subsequent to his complaint of race discrimination. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 690 (7th Cir. 2001) (plaintiff's allegations in her federal suit not included in her EEOC charge which detailed her hostile work environment claim regarding "newly imposed maintenance assignments, negative comments, and an increased workload" grew out of her the allegation in her charge that alleged "sex discrimination and harassment"); *Copot v. Steward Title Guaranty Co.*,

24

2020 WL 1848204, at *4 (N.D. Ill. April 13, 2020); *Perez v. Globe Ground N. Am., LLC*, 482 F.Supp.2d 1023, 1029 (N.D. Ill. 2007) (although plaintiff "did not outline every instance of harassment that she alleges occurred at [defendant] in her EEOC charge," she was not precluded from bringing these allegations in her complaint because it was likely that the EEOC's investigation "would have discovered the other instances of harassment alleged in the complaint."); *Cf. Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 530 (7th Cir. 2003) (plaintiff's allegation of race discrimination regarding a write up would not have been uncovered by an EEOC investigation where the charge referenced three different, specific instances of discriminatory conduct and contained no general allegation regarding her supervisor's conduct). Accordingly, the Court finds McKinney's retaliatory harassment allegations fall within the scope of his charge. *Williams v. Phillips 66 Co.*, 72 F.Supp.3d 938, 955 (S.D. Ill. 2014) (holding in considering plaintiff's hostile work environment claim, the court could properly consider other instances of harassment by plaintiff's coworkers that were "not fully described or explicitly included in the EEOC charge" because those incidents were reasonably related to the allegations of the charge and grew out of such allegations).

Moreover, several of the incidents that contributed to the alleged retaliatory hostile work environment occurred after the filing of McKinney's June 14, 2019 EEOC charge: (1) exclusion from work meetings in July 2019; (2) denial of necessary keys and tools beginning on August 15, 2019 and again in early 2021; (3) noose found in his workplace on July 16, 2020; and (4) unsafe work assignment on high voltage "stingers" on September 21, 2020. McKinney Decl., at ¶¶ 35, 37, 39, 40. This post-EEOC charge conduct can serve as the basis of McKinney's retaliation claim despite the fact that it was not specifically alleged in his EEOC charge based on a different line of Seventh Circuit precedent. The Seventh Circuit has "long held that a plaintiff need not file a new

charge alleging post-charge retaliation by the employer." *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 857 n.11 (7th Cir. 2019); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013) ("We have held for practical reasons, to avoid futile procedural technicalities and endless loops of charge/retaliation/charge/retaliation, etc., that a plaintiff who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation."); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 481-83 (7th Cir. 1996). For these reasons, the Court rejects CTA's argument that McKinney failed to exhaust his administrative remedies under Title VII as to his "list of grievances" in paragraph 10 of his Second Amended Complaint.

Two related issues remain. First, CTA contends that McKinney may not seek to establish an adverse employment action by showing a retaliatory hostile work environment because he did not plead a "hostile work environment" claim in his complaint. Doc. 75 at 3. However, McKinney was not required to use the words "hostile work environment" in his complaint. *See Jajeh v. Cty. Of Cook*, 678 F.3d 560, 567 (7th Cir. 2012). In his complaint, McKinney did allege that he was subject to a "campaign of harassment" in retaliation for complaining about race discrimination. SAC ¶ 10. As detailed above, that same paragraph identifies a number of incidents of alleged harassment. The complaint further alleges that CTA failed to take action in response to the alleged retaliatory harassment. *Id*. at 11. Given the reference to a "campaign of harassment," the numerous examples that could be construed to support a hostile work environment claim, and CTA's alleged failure to take remedial action in response to McKinney's complaints of harassment, McKinney asserted a hostile work environment claim based on retaliation in his complaint. *See Jajeh*, 678 F.3d at 567 (holding hostile-work-environment claim was properly raised in the complaint even though the complaint did not use that term where it alleged that plaintiff was subject to severe

harassment because of his religion and national origin, detailed how the harassment altered the conditions of his employment, and alleged defendant failed to take remedial action in response to the alleged harassment). CTA also claims McKinney's failure to state "hostile work environment" anywhere in his complaint failed to give it sufficient notice of the hostile work environment claim. But it is clear that CTA believed a retaliatory hostile work environment claim was properly raised, otherwise it would not have asserted a *Faragher-Ellerth* affirmative defense in its answer. Doc. 37 at 7, Affirmative Defense No. 4.[36]

Second, CTA argues that McKinney's noose allegation "should be barred because counsel had numerous opportunities to plead the noose allegation and chose not to do so until his second amended complaint—eight months after the incident occurred." Doc. 64 at 10. CTA cites no authority to support its position that the Court should not consider the noose incident for purposes of the retaliation claim because McKinney did not mention it until his Second Amended Complaint, and thus, forfeiting the allegation. In any event, McKinney was not required to explicitly plead the noose incident prior to his Second Amended Complaint for it to properly be used as evidence supporting his claim of a retaliatory hostile work environment. *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011) ("plaintiffs in federal court are not required to plead with precision . . . detailed facts."); *Livingston v. City of Chicago*, 2020 WL 91274, at *4 (N.D. Ill. Jan. 7, 2020) ("[p]laintiffs are not required to set out all of the pertinent

---

[36]    "An employer may escape liability if it can show the hostile work environment [created by a supervisor] was not accompanied by an adverse employment action and prove an affirmative defense. The *Faragher-Ellerth* defense is one such defense and requires the employer prove by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627–28 (7th Cir. 2019)

facts that support their claims in the complaint.").  CTA's request to prohibit consideration of the noose allegation for purposes of the retaliation claim is therefore denied.

### B.    Materially Adverse Action

CTA next argues that McKinney did not suffer an adverse employment action in the form of a hostile work environment.  Material adversity in the retaliation context requires a plaintiff to show that the employer's action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotes and citations omitted); *Poullard v. McDonald*, 829 F.3d 844, 858 (7th Cir. 2016) (the relevant question is whether the retaliatory conduct is "serious enough to dissuade a reasonable employee from engaging in protected activity.").  "In defining 'retaliatory hostile work environment,' courts in this Circuit have required plaintiffs show, among other things, that the environment was 'objectively and subjectively offensive' and the conduct was 'severe or pervasive.'" *Gordon v. Bd. of Trustees of University of Illinois-Chicago*, 2021 WL 4439429, at *9 (N.D. Ill. Sept. 27, 2021) (citing *Flanagan*, 893 F.3d at 375); *see also Boss*, 816 F.3d at 920.[37]  To determine whether a work environment is hostile, courts consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920.  "One extremely serious act of harassment could rise to an

---

[37]    Because McKinney's "claim is retaliation, not hostile work environment, [] the precise standard for 'materially adverse' that governs [his] case is that discussed in *Burlington Northern*, as opposed to the 'severe or pervasive' standard that is primarily discussed in caselaw involving standalone hostile work environment claims." *Gordon*, 2021 WL 4439429, at *9 n.3.  Nevertheless, "the objectivity, severity, and pervasiveness of workplace harassment is directly relevant to *Burlington Northern's* inquiry into whether an employer's action would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington Northern*, 548 U.S. at 68).

actionable level as could a series of less severe acts." *Hall v. City of Chicago* 713 F.3d 325, 330 (7th Cir. 2013).

Believing his version of the facts, McKinney has easily produced enough evidence to create an issue of fact on whether he subjectively perceived his work environment to be offensive. McKinney reported the conduct he found harassing on repeated occasions to CTA, including in UORs in February and March 2019, a meeting with Messina in March 2019, a meeting with Johnson in April 2019, and a meeting with Messina and Romano in June 2019 and he filed an EEOC charge in June 2019 complaining of retaliatory harassment and EEO complaints with CTA in March and May 2021. *Hall*, 713 F.3d at 332; *Gordon*, 2021 WL 4439429, at *9. McKinney also asserts that the treatment by Simmons and his co-workers caused him significant emotional distress, depression, and anxiety, and he sought and received psychological counseling for his symptoms. McKinney Decl., ¶ 44; *Passananti v. Cook County*, 689 F.3d 655, 669 (7th Cir. 2012); *Haugerud*, 259 F.3d at 695. CTA argues that McKinney's failure to bring the noose to the attention of the CTA sooner undermines his argument that it was subjectively or objectively offensive. Doc. 75 at 13. But McKinney explains that he did not report the noose incident to CTA sooner because he did not believe any action would be taken, given CTA's previous inaction regarding his numerous complaints. McKinney Decl. ¶ 38. Disbelieving McKinney's explanation would require the Court to weigh the evidence or assess his credibility, which the Court cannot do at summary judgment. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *Passananti*, 689 F.3d at 669.

Considering the evidence as a whole, the incidents alleged by McKinney also rise to the level that is sufficiently objectively offensive and severe or pervasive. Although the complained-of conduct must go beyond "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," *Silk v. City of Chi.*, 194 F.3d 788, 807 (7th Cir. 1999), the "working

environment [need not] be 'hellish' before a [hostile work environment] suit can succeed," *Jackson v. Cnty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007); *Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 729 (7th Cir. 2009) ("'[P]etty slights, minor annoyances, and simple lack of good manners' are normally not sufficient to deter a reasonable person."). Under the rules governing summary judgment, the Court "must assume" that Simmons and McKinney's coworkers "did and said everything" that McKinney attributes to them. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382 (7th Cir. 2020). Viewing this evidence cumulatively, a reasonably jury could find these incidents were frequent, humiliating and some incidents were physically threatening. Indeed, the noose alone qualifies an "extremely serious act of harassment" based on race and is meant to "convey [a] threat[] of physical harm" and "to arouse fear" in the person to whom it is directed. *Hall*, 713 F.3d at 330; *Welch v. Eli Lilly & Co.*, 2013 WL 4413323, at \*23 (S.D. Ind. Aug. 15, 2013); *see also Cole v. Bd. of Tr. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (the noose has a "disturbing history and status as a symbol of racial terror.") *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 635 (7th Cir. 2009) ("The noose in this context is a symbol not just of racial discrimination or of disapproval, but of terror. . . . [and noting] the very real, very significant fear that such symbols inspire in those to whom they are targeted."). Some of the other harassment of which McKinney complains is also physically threatening (such as unsafe job assignments). Moreover, the record indicates that the alleged harassment interfered with McKinney's ability to perform his job because he was excluded from meetings and training opportunities, forced to work alone when he should have had assistance, denied necessary work materials, and his foreman and the stand-in foreman ignored his work communications or lied to him about work matters. *Cf. Boss,* 816 F.3d at 920 (plaintiff did not show that he was subject to a workplace that was objectively abusive where he "was not physically threatened or humiliated, and much of the 'interference'

with his job was [] reasonable: it stemmed from his own failure to meet legitimate employment expectations.").

CTA makes several arguments about why the noose incident was not objectively offensive or sufficiently severe/pervasive to create a hostile work environment. Doc. 75 at 9-11. In particular, CTA argues that the noose incident was not sufficiently severe to create a hostile and abusive working environment because McKinney saw a "noose" on one occasion and he fails to identify who hung up the noose, how long the noose was hanging before he observed it, how long the noose remained after the incident, or how the noose was specifically targeted at him. *Id*. at 10-11.[38] None of CTA's arguments are convincing at the summary judgment stage. *First*, McKinney has provided sufficient evidence that would enable a reasonable fact-finder to conclude that the noose was directed at him. On that day in July of 2020, foreman McCann instructed McKinney to inspect electricity at a job site at the 54th Street Rail shop, which is a very large building with only a few employees typically present. DSOF ¶¶ 48, 49; Pl's Resp. DSOF ¶¶ 48, 49; McKinney Decl. ¶ 37. When he arrived at the station, McKinney found a rope hanging fashioned into a noose "right next to one of the boxes [he] was sent to inspect." McKinney Decl., ¶ 37; DSOF ¶ 49; Pl's Resp. DSOF ¶ 49. There is enough here for a factfinder to conclude that the noose was intentionally left in that location for McKinney to find.

*Second*, CTA "is not exonerated from liability simply because [McKinney] cannot come forward with camera footage or eyewitness testimony to conclusively establish how the noose

---

[38]     Quoting the word "noose" in its briefs, CTA seems to suggest that there was no noose placed at McKinney's workplace or that the hanging rope McKinney found was not in a shape of a noose. Doc. 64, 2, 15, 17; Doc. 75 at 13, 14. Crediting McKinney's version of events, however, a jury could find that McKinney found a noose displayed right next to the electrical box he was sent to inspect. McKinney Decl. ¶ 37. There is also a picture of the alleged noose in the record, which supports a conclusion that the rope was in the shape of a noose. Doc. 70-1 at 23; *Rogers v. Ford Motor Co*., 2018 WL 3344539, at *8 n.6 (N.D. Ill. July 6, 2018) ("Although it is the trier of fact's job to determine whether the rope was arranged as a noose, the photo makes clear that such a perception is not beyond the bounds of reason.").

arrived at [his] work[] location." *Rogers*, 2018 WL 3344539, at *7 ("It is not surprising that if someone did place the noose at Rogers' workstation, it was done covertly to avoid punishment."). In the end, "[h]ow and why the rope appeared at [McKinney's] work [] location is a question for the trier of fact." *Id.* Further, the fact that McKinney does not know who hung up the noose "makes it more intimidating, because [he] did not know which of [his] co-workers to be wary of." *E.E.O.C. v. WRS Infrastructure and Environment, Inc.*, 2011 WL 4460570, at *10 (N.D. Ill. Sept. 27, 2011).

*Third*, CTA points out that there were several other employees, including at least one African American employee, working at the 54th Street Rail shop the day the noose was found. CTA asserts that these other employees "did not seem to think anything was awry" or "unusual about the 'noose.'" Doc. 75 at 13, 14 (citing DSOF ¶ 50). But paragraph 50 of Defendant's Statement of Facts does not support this assertion, nor does the underlying citation to McKinney's deposition. These facts are disregarded because they are unsupported by citation to any evidence. LR 56.1(d)(2). CTA also argues McKinney's principal complaint is about Joe Simmons and Joe Simmons did know McKinney would be at the 54th Street Rail shop that day, but the Court also disregards this unsupported statement. Doc. 75 at 15.

*Fourth*, a retaliatory harassment claim may be based on racially offensive conduct. *Poullard*, 829 F.3d at 858 ("The question is still whether the racially offensive conduct [] is serious enough to dissuade a reasonable employee from engaging in protected activity."). The Court declines to find, as a matter of law, that a single instance of a noose displayed in the workplace, arguably directed at a particular African American employee who had complained of race discrimination, is insufficiently severe to support a retaliatory hostile work environment claim. *See Cole*, 838 F.3d at 897 (declining to "lay down [] firm rules for when a noose in the workplace is or is not severe enough to be actionable"); *Rogers*, 2018 WL 3344539, at *8 (rejecting

employer's suggestion that "it would be a trivial harm and petty slight if an African American employee found a noose hanging from his workstation after complaining about racial discrimination.").

Ultimately, considering the noose incident along with all of the actions taken by Simmons and McKinney's coworkers after October 23, 2018, including a toy rat placed at his work station, unsafe work assignments, loss of his service vehicle and forced to ride CTA trains to work assignments carrying his tools and equipment, coworkers refusing to assist him and telling him they had been instructed not to help him, exclusion from work meetings and training, denial of necessary keys, tools, and personal protective equipment, being told by acting foreman that he was assigned as his personal foreman to "eradicate the problem," being told by coworker and acting foreman that he could get his vehicle and job assignment if he would "stop making waves" and apologize, being told by coworker and acting foreman that foreman was "targeting" him because of his race and race discrimination complaint, being told by acting foreman that foreman was "targeting" him in order to get him fired or to pick out of preferred group, and a noose placed in his workplace, the Court finds a reasonable jury could view that conduct as objectively offensive and severe or pervasive enough to dissuade a reasonable employee from exercising his Title VII rights. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury."); *Robinson v. Perales*, 894 F.3d 818, 833-34 (7th Cir. 2018) (holding plaintiff "subjected not simply to increased surveillance but a campaign designed to damage or end his career as a UIC officer, and his supervisors enlisted others, including his watch commander, to aid in this goal" was the "kind of conduct that would dissuade a reasonable officer from making a complaint in the first place."); *Rogers*, 2018 WL 3344539, at *8 ("[t]he

discovery of a noose at a workstation could discourage an employee from pursuing any discrimination complaint.").

### C.    Causation

Next, to prevail on a retaliatory hostile-work-environment claim, there must be a "causal link between the protected expression and the adverse action." *Knox v. State of Ind.*, 93 F.3d 1327, 1333-34 (7th Cir. 1996). "To prove causation, the plaintiff must show that the desire to retaliate was the but-for cause of" a materially adverse action, which means that the retaliatory action "would not have occurred in the absence of" his protected activity. *Robinson*, 894 F.3d at 830 (7th Cir. 2018) (internal quotes omitted). The Court must "assess cumulatively all the evidence" on which McKinney relies "to determine whether it permits a reasonable factfinder to determine" that he was harassed because of his protected activity. *David v. Bd. of Trustees of Community College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Considered as a whole, McKinney has provided sufficient evidence supporting the requisite casual connection. Specifically, the comments that McKinney attributes to Hernandez and Burnett after he filed his initial race discrimination complaint about Simmons connect the listed incidents of harassment to McKinney's complaint about race discrimination. McKinney's Decl., ¶ 18 ("[A]fter hearing Schak yell at me in a phone call, Gabe Hernandez [] told me all of this could stop and I could go back to how things were with my CTA vehicle and Red Line responsibility if I would stop making waves."); *id*. ("Gabe Hernandez and co-worker Terry Burnett told me that everyone knew that Joe Simmons was targeting me because I . . . had fought against giving up my picked spot to white electrician Michael Crudele, but I should apologize and be sent back to the Red Line and get my CTA vehicle back."); *id*. ("Terry Burnett told me that Joe Simmons was targeting me in order to get me fired or pick out of the Light Maintenance Rail group."); *id*. ¶ 26 ("Terry Burnett told me he had been appointed to be my personal foreman and

34

they were going to 'eradicate the problem.'").  These comments are relevant evidence from which a reasonably jury could infer Simmons and McKinney's coworkers had a retaliatory motive and thus, a causal connection.  Moreover, the toy rat left at McKinney's work station itself is circumstantial evidence of causation. *Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005) (coworkers' reference to plaintiff as a "'rat' (a term that connotes an informer or snitch)" "itself offered circumstantial evidence of causation" in retaliatory harassment case).  Viewing this evidence cumulatively, the Court concludes a reasonable jury could find that McKinney's protected activity was the but-for reason for the harassing conduct he alleges.

### D.    Employer Liability

Finally, CTA argues that summary judgment is warranted because there is no basis for imposing employer liability in this case.  "The Supreme Court has held that Title VII does not demand employers be held vicariously liable for hostile work environments created by supervisors unless it is accompanied by an adverse employment action." *Hunt*, 931 F.3d at 627.  Specifically, an "employer may escape liability if it can show the hostile work environment was not accompanied by an adverse employment action and prove an affirmative defense." *Id*. at 628.  The affirmative defense requires the employer to establish by a preponderance of the evidence that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *Id.*

On the other hand, "an employer is liable for the harassment of a nonemployee or nonsupervisory employee if it was 'negligent either in discovering or remedying the harassment.'" *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (internal citation omitted)).

"To prove negligence, an employee usually must make a 'concerted effort to inform the employer that a problem exists.'" *Id.* (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004) (internal citation omitted)). "This would include lodging a complaint with human resources or telling high-level management about the harassment." *Id.* "Once an employer is aware of workplace harassment, it can avoid liability by taking prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Jajeh*, 678 F.3d at 569 (citations and quotation marks omitted). "[A] prompt investigation is the hallmark of a reasonable corrective action." *Porter*, 576 F.3d at 636 (internal quotation marks omitted). Under this coworker standard, a plaintiff can offer "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Vance v. Ball State University*, 570 U.S. 421, 449 (2013).

This case involves both supervisor and co-worker harassment, so the Court considers CTA's liability under both frameworks for Title VII. Starting with supervisor liability, CTA has not met its burden. CTA's primary argument in support of summary judgment on the employer liability issue is that it cannot be held liable on McKinney's "noose claim" because he did not promptly complain about the noose incident. Doc. 75 at 18-19.[39] With regard to the second element of the affirmative defense to supervisor conduct, "[o]ne sign of unreasonable behavior on [a] plaintiff['s] part is undue delay in calling the problem to the employer's attention." *Jackson*, 474 F.3d at 502. It is true that McKinney did not report the noose incident to CTA until March 1,

---

[39] McKinney does not argue that the alleged harassment culminated in a tangible employment action against him. A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Vance*, 570 U.S. at 429. It is undisputed that during his time as an electrician with CTA, McKinney has never experienced a diminution in salary and has never been demoted or subject to a change in his title. DSOF ¶¶ 25-26; Pl's Resp. DSOF ¶¶ 25-26. McKinney has only experienced pay increases with CTA, increasing from a $44 hourly rate in 2017 to a $49 hourly rate in 2020. *Id.* ¶ 27.

2021, more than seven months after it occurred. Doc. 65-2 at 141-43. McKinney's explanation for the delay in reporting the noose incident is that he thought it "wouldn't do any good" and CTA "wouldn't take any action in response," given its "previous non-responsiveness to [his] complaints." McKinney Decl. ¶ 38. Although an employee has an obligation to report alleged harassment, *see Porter*, 576 F.3d at 638 (holding that an "'employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment'"), the record reflects that McKinney complained about retaliation and harassment several times before the noose incident and CTA's EEO department failed to investigate all but one of McKinney's complaints (doc. 65-2 at 5). CTA also failed to take any type of corrective action with the exception of Georges addressing the missing key situation in the fall of 2019. On this record, the Court cannot find as a matter of law that McKinney unreasonably failed to avail himself of CTA's preventive or remedial apparatus by failing to report the July 2020 noose incident sooner. In other words, a jury must determine whether under these circumstances, McKinney's failure to complain about the noose incident prior to March 2021 was unreasonable. *See Passananti*, 689 F.3d at 669 (where there was no evidence defendant "ever conducted an investigation or followed up in any way on the plaintiff's complaint" of harassment, "the jury easily could have found, as [plaintiff] testified, that further complaints would have been futile.").

Moreover, McKinney's eventual use of the complaint procedure yielded no results. There is no evidence that once CTA became aware of the noose incident on March 1, 2021, it took any steps in responding to the allegation. *Cf. Nelson v. Idleburg*, 2020 WL 2061555, at *11-12 (N.D. Ill. April 29, 2020) (holding there was no basis for employer liability where plaintiff did not report a noose incident until six months after it occurred, but after he complained about the incident, the

employer "took prompt and appropriate steps in responding to his complaint."). Furthermore, CTA does not contend that McKinney failed to take advantage of any preventive or corrective opportunities provided by CTA regarding any of the other harassing incidents other than the noose incident. *Cf. Hunt*, 931 F.3d at 631 (where plaintiff "failed to take advantage of *any* reporting mechanisms for four months," she "prevented [defendant] from taking corrective measures.") (emphasis added).

Even if it were undisputed as to whether McKinney unreasonably failed to take advantage of corrective measures regarding the noose incident, a grant of summary judgment on the employer liability issue would be inappropriate because McKinney presented sufficient evidence to raise a genuine issue of material fact as to whether CTA exercised reasonable care to prevent and promptly correct retaliatory harassing behavior, which is the first element of the affirmative defense. CTA claims it took "serious action in investigating" McKinney's complaints of retaliatory harassment brought to its attention. Doc. 75 at 19. CTA supports this contention by stating that McKinney "had multiple meetings and correspondence with human resources, an interview was taken of Joe Simmons regarding the alleged conduct, and the CTA's EEOC division conducted an investigation into the matter." *Id*. CTA also had an anti-retaliation policy and a procedure for reporting harassment or retaliation. *See* Doc. 65-2 at 151 (prohibiting "[r]etaliation against an employee or applicant because he or she filed a complaint, or otherwise engaged in protected activity."). "An employer's adoption of an effective anti-harassment policy is an important factor in determining" the reasonableness of its actions. *Hunt*, 931 F.3d at 630 (7th Cir. 2019) (finding no basis for employer liability where policy included "robust" reporting measures and employer promptly investigated reported conduct). The mere existence of such a policy, however, does not necessarily establish that the employer acted reasonably in remedying the

harassment after it has occurred or in preventing future misconduct." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 953 (7th Cir. 2005).

Here, a reasonable jury could find that CTA's anti-retaliation policy was ineffective and that it failed to adequately respond to prior complaints of retaliatory harassment. CTA does not contend that McKinney failed to bring his complaints to the proper authorities through the proper complaint procedures. And McKinney has presented evidence that he notified CTA numerous times of the retaliation and harassment and that nothing was done to address the campaign of retaliatory harassment.[40] The only investigation CTA conducted was with respect to McKinney's complaint that Simmons removed him from his pick in September 2018 because of his race, Simmons took away his CTA vehicle in October 2018, and Schak did not properly prepare McKinney's work assignments in November 2018. Doc. 65-2 at 5. As to those complaints, the CTA determined that "these matters do not involve a potential violation of CTA's policies prohibiting harassment, discrimination, bullying, or retaliation." *Id.*[41] As already noted, CTA failed to act on numerous other complaints of retaliation and harassment. CTA has not shown that it investigated or took any type of corrective action in response to: (1) McKinney's complaint to CTA management in February 2019 that he discovered a toy rat in his workspace, which he believed was a "clear example of job harassment"; (2) his March 2019 complaint of "perceived

---

[40]     After McKinney complained to Georges in September 2019 that he was "literally unable to use the restroom at CTA locations without borrowing keys from coworkers or other CTA employees," he was given keys. DSOF ¶¶ 57-58; Pl's Resp. DSOF ¶¶ 57-58. A reasonable jury could find, however, that the CTA's response was insufficient to address or remedy the overall harassing behavior McKinney suffered. Georges addressed only one problem (missing keys) and his response failed to address the missing keys as part of a larger campaign of retaliatory harassment. There is no evidence CTA did anything to remedy the other problems alleged by McKinney.

[41]     CTA fails to offer any details about how it conducted its investigation into these allegations other than its claim that Joe Simmons was interviewed. But the evidence cited does not support the CTA's claim that it in fact interviewed Joe Simmons as part of its investigation. Doc. 75 at 19 (citing DSOF ¶ 43; Pl's Resp. DSOF ¶ 43; DSOF ¶ 3b, Pl's Resp. DSOF ¶ 3b; DSOF ¶ 3f, Pl's Resp. DSOF ¶ 3f; DSOF ¶ 3j, Pl's Resp. DSOF ¶ 3j).

harassment in the workplace"; (3) his March 27, 2019 conversation with Messina regarding his concerns about his experience working as a CTA electrician; (4) his April 9, 2019 complaint to Johnson about the "rat event and other incidents of harassment"; (5) his June 14, 2019 EEOC charge complaining about retaliatory harassment; (6) his June 27, 2019 complaint to Messina and Romano about "the course of harassment he was undergoing"; (7) his March 1, 2021 EEO complaint with CTA about the noose incident; and (8) his May 24, 2021 EEO complaint with CTA alleging that he had been "consistently retaliated against by CTA management" and reporting the noose incident, among other incidents. DSOF ¶¶ 3c-3f, 3i, 3j; Pl's Resp. DSOF ¶¶ 3c-3f, 3i, 3j; McKinney's Decl. ¶¶ 19, 20, 28, 34; Pl's Dep. 324:6-19. Doc. 65-2 at 2-3, 141-143, 145-147; 266-274; Doc. 70-1 at 21-22. A jury could reasonably interpret these omissions as a failure by CTA to exercise reasonable care to effectively prevent and promptly correct harassing behavior. *Cerros*, 398 F.3d at 954 ("[T]he absence of [a prompt investigation] may signal a failure to meet this standard of 'prompt and appropriate corrective action.'"); *Haugerud*, 259 F.3d at 699 (concluding, as a matter of law, that employer could not be found to have exercised reasonable care to prevent supervisors' harassing conduct where "[n]o internal investigation was pursued and no remedial action was taken" in response to plaintiff's complaint of harassment).

Turning to the CTA's Title VII liability for co-worker harassment and drawing all reasonable inferences in McKinney's favor, the summary judgment record also suggests that CTA was negligent in responding to explicit complaints about harassment and retaliation based on its failure to investigate and remedy nearly all of his complaints. *Cole*, 838 F.3d at 898 ("A prompt investigation is the first step toward a reasonable corrective action."); *Isaacs v. Hill's Pet Nutrition, Inc.,* 485 F.3d 383, 386 (7th Cir. 2007) (employer "[d]oing nothing after receiving multiple complaints about serious [complaints of harassment] is a straight road to liability under Title VII");

40

*Haugerud*, 259 F.3d at 700 (concluding that "a reasonable fact finder could find that the School District's failure to take any steps to investigate plaintiff's allegations or to act on them in any way constituted negligence.").

Accordingly, for all the foregoing reasons, CTA is not entitled to summary judgment on the retaliatory hostile work environment claim.

## II.    Race Discrimination Claim Based on Hostile Work Environment

McKinney also asserts that he was subjected to a racially hostile work environment in violation of Title VII. Doc. 32, ¶¶ 10, 16.[42]  CTA has not established that it is entitled to summary judgment on McKinney's racial hostile work environment claim under Title VII. Docs. 64, 75. Rather, CTA's briefing regarding evidence of alleged harassment focuses entirely on the retaliation claim in the Second Amended Complaint. *See* Doc. 75.  CTA's only contention as to the racial harassment claim appears to be that McKinney's "noose claim" is unexhausted because "he failed to include it or any complaint regarding Duffy McCann in his EEOC charge." Doc. 75 at 19.  This assertion consisted of one sentence in CTA's reply brief, intertwined in a discussion on the retaliation claim, and without any elaboration or analysis.  Because this apparent reference to a racial harassment claim is perfunctory and undeveloped, it is waived. *M.G. Skinner & Assocs. Ins.*

---

[42]    In its opening brief, CTA argued that it is entitled to summary judgment on McKinney's claim for race-based discrimination related to (1) his removal from his picked group and transfer to the Northside Facilities/Garages group and (2) his denial of a CTA vehicle which forced him to ride the CTA lines to work assignments. Doc. 64 a 19-27.  It is unclear whether McKinney's complaint raises a standalone race-based disparate treatment claim related to his transfer and denial of a CTA vehicle, as opposed to a disparate treatment claim related to the denial of overtime based on race and a race-based hostile work environment. *See* Doc. 32 at ¶ 16.  Even if it did, McKinney's response in opposition to summary judgment failed to defend a race-based disparate treatment claim based on his transfer out of his picked group and denial of a CTA vehicle, but instead focuses on whether he was subjected to racial harassment, citing the placement of the noose in his workplace. Doc. 69 at 32.  As a result, McKinney has abandoned any disparate treatment race discrimination claim relating to his removal from his picked group and denial of a CTA vehicle. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016); *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008).  And he has withdrawn his allegation that he was denied overtime because of his race and in retaliation for his complaint of race discrimination.

*Agency, Inc.*, 845 F.3d at 321. In any event, on the EEOC charge form, McKinney checked the box indicating discrimination based on "race" and indicated he had "been harassed." Doc. 65-2 at 2. To the extent CTA also moved for summary judgment on the merits of McKinney's race-based hostile work environment claim on the same grounds that it raises on the retaliation claim, CTA's motion is denied for the same reasons discussed above.

## <u>CONCLUSION</u>

For the reasons set forth above, CTA's motion for summary judgment [63] is denied with respect to the race-based hostile work environment claim and retaliation-based hostile work environment claim. These are the only two claims remaining in this case and they will be set for a jury trial at the next status hearing. This case is set for a telephonic status hearing on July 7, 2022 at 9:15 a.m.

**SO ORDERED.**

Dated: June 23, 2022

_____
Sunil R. Harjani
United States Magistrate Judge