**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LASONA MCKINNEY,

       Plaintiff,

    v.

CHICAGO TRANSIT AUTHORITY,

       Defendant.

Case No. 20 C 6093

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Lasona McKinney, an African American electrician, sued his current employer, Chicago Transit Authority ("CTA"), alleging racial and retaliatory harassment by his coworkers in violation of Title VII. The parties went to trial in January 2023.[1] On January 27, 2023, the jury returned a split verdict. On the racial harassment claim, the jury found in favor of CTA. On the retaliatory harassment claim, the jury found in favor of McKinney, awarding him $99,000 in compensatory damages. Pursuant to Federal Rule of Civil Procedure 59, CTA now moves for a new trial on liability and damages, a new trial on damages alone, or a remittitur of the jury's award on the retaliatory harassment claim. Because none of CTA's arguments demonstrate that the verdict is against the manifest weight of the evidence, that it did not receive a fair trial, or that the damages are excessive, the Court denies CTA's motion [168] in its entirety.

## BACKGROUND

McKinney has worked as an electrician for CTA since July 2017. Once a year, CTA electricians "pick" by seniority into the group they want to work in, either the light rail maintenance group, the construction group, the subway group, the North Side garage/facilities

---

[1] The parties consented to the jurisdiction of the undersigned magistrate judge. *See* 28 U.S.C. §636(c).

group, or the South Side garage/facilities group. In May 2018, McKinney used his seniority to pick into the light rail maintenance group where he covered the Red Line on the South Side of Chicago. At that time, Joe Simmons, Sr. ("Simmons") was the foreman of the light rail maintenance group and the construction group. Several months later, in September 2018, Simmons involuntarily moved McKinney from the light maintenance group to the North Side garage/facilities group and replaced McKinney with a junior white electrician from the construction group, Michael Crudele. Under McKinney's theory, once an electrician picks into a group, he cannot be moved to another group without his consent.

Believing that he was moved from his picked spot because of his race, in October 2018, McKinney filed an internal EEO complaint with the CTA, alleging that Simmons discriminated against him based on his race when Simmons involuntarily moved him from his 2018 job pick and replaced him with a white electrician. In June 2019, he filed a charge of discrimination with the EEOC alleging, among other things, that he had been transferred to a different worksite because of his race. In his EEOC charge, McKinney also claimed that after he complained about race discrimination, he had been harassed for engaging in protected activity. This lawsuit followed on October 13, 2020.

During trial, McKinney testified that he was subjected to a campaign of retaliatory harassment by certain coworkers, led primarily by Simmons, because he complained about race discrimination by Simmons. He testified, for instance, that the retaliation included the taking away of his CTA vehicle and Red Line responsibilities, excluding him from work meetings, training sessions, and the tour of a new train station, coworkers giving him sabotaged light fixtures, a coworker telling him he could have his CTA vehicle and Red Line responsibilities back if he "stop[ped] making waves," coworkers telling him that he was being "targeted" by Simmons

because he is Black and fought against giving up his picked spot to a white electrician and that he needed to apologize to Simmons to get his CTA vehicle and Red Line job back, leaving a toy rat at his work computer, being following by Simmons' brother, giving him unsafe work assignments, coworkers refusing to assist him on joint projects because Simmons told them not to help him, a coworker telling him he had been assigned as McKinney's personal foreman to "eradicate the problem," denying him necessary keys and tools, and leaving a hangman's noose at his assigned work station. McKinney testified that he complained to CTA's EEO department about the retaliatory harassment, but they did not protect him from further acts of retaliation. For its part, CTA claimed that it thoroughly investigated McKinney's complaints of retaliatory harassment and determined they were unfounded.

## ANALYSIS

Under Rule 59, a court may "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Bowers v. Dart*, 1 F.4th 513, 521 (7th Cir. 2021) (quoting *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014)). When considering whether the jury's verdict goes against the manifest weight of the evidence, the court performs "its own assessment of the evidence presented" and views the evidence "neutrally." *Lewis v. McLean*, 941 F.3d 886, 893 (7th Cir. 2019) (quoting *Mejia v. Cook Cty.* 650 F.3d 631, 634 (7th Cir. 2011)). In assessing a motion for a new trial, the trial judge "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633 (citing *Byrd v. Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525, 540 (1958) ("The trial judge in the

federal system has powers denied the judges of many States to comment on the weight of evidence and credibility of witnesses . . . . "); *United States v. Washington,* 184 F.3d 653, 658 (7th Cir. 1999) ("In considering the weight of the evidence, the court must necessarily consider the credibility of the witnesses.")).  Ultimately, the court's "narrow" role is to determine whether a "reasonable basis exists in the record to support the verdict." *Lewis*, 941 F.3d at 634. (quoting *Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008)).  Put another way, a "verdict is set aside only if no rational jury could have rendered it." *Id.*

CTA believes that it is entitled to a new trial for four main reasons: (1) McKinney failed to exhaust his administrative remedies for his post-August 2019 incidents of alleged retaliatory harassment; (2) McKinney failed to prove that his coworkers knew about his race discrimination complaints; (3) several evidentiary errors by the Court prejudiced CTA; and (4) the jury's compensatory damages award was excessive.  With the above standards in mind, the Court addresses each argument in turn.

## I.     Exhaustion

As to its first argument, CTA contends that McKinney failed to exhaust his administrative remedies under Title VII for post-August 2019 acts of retaliatory harassment, including the noose incident, that occurred after he filed his EEOC charge in June 2019.  CTA points out that McKinney picked into a new group (the South Side garage/facilities group) in August 2019 and began reporting to a different foreperson, Duffy McCann, and thus, it argues that McKinney was required to file a new EEOC charge for that time period.  CTA argues that the admission of the post-August 2019 acts of retaliatory harassment prejudiced CTA at trial and warrants a new trial.

CTA is incorrect that it is entitled to a new trial on this basis.  First, exhaustion and the fact that McKinney did not file a second EEOC charge related to the post-August 2019 incidents of

retaliatory harassment *were not jury issues*. The issue of whether instances of retaliatory harassment are within the scope of an EEOC charge is a question of law to be decided by the court, not a question of fact. *Moore v. Vital Products, Inc.*, 641 F.3d 253, 257 (7th Cir. 2011); *Conner v. Illinois Dept. of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005). At summary judgment, the Court ruled as a matter of law that McKinney had exhausted his administrative remedies. CTA does not explain how the Court's ruling on exhaustion at summary judgment requires a new trial now under Rule 59, nor does it direct the Court to any authority supporting a new trial on such ground. More bluntly—Why is this issue, which was not part of the jury trial, being raised now on a Rule 59(a) motion for a new trial? CTA has said nothing on this and not surprisingly. Under Rule 59(a), "the district judge must determine if 'the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party.'" *Frizzell v. Szabo*, 647 F.3d 698, 702 (7th Cir. 2011). The focus of a Rule 59(a) motion is on the trial, namely, the evidence admitted at the trial, the Court's jury instructions at trial, and the jury's verdict at the end of the trial. Exhaustion was not a jury issue at the trial. Thus, it is wholly improper for the CTA to raise this issue in a Rule 59(a) motion and seek relief now.

Moreover, CTA did not make the Court aware of its current exhaustion position prior to or during trial, so it is also clearly waived. In its summary judgment motion, CTA's theory of exhaustion was that nine specific incidents of alleged retaliatory harassment, which occurred both pre- and post-August 2019, had not been administratively exhausted because McKinney did not list them in his EEOC charge and did not put CTA on notice of these incidents until after he filed his June 14, 2019 EEOC charge. *See* Doc. 64 at 11; *McKinney v. Chicago Transit Auth.*, 2022 WL 2257246, at *10-12 (N.D. Ill. June 23, 2022). Only four of the nine incidents CTA objected to at summary judgment occurred after he joined McCann's group in August 2019. *McKinney*, 2022

WL 2257246, at *10, 12. The Court found that exhaustion was not an issue because McKinney alleged retaliatory harassment in his EEOC charge, and the examples of retaliatory harassment cited by the CTA were not beyond the scope of McKinney's EEOC charge. *Id.* at *11. McKinney's June 2019 EEOC charge alleged that retaliatory harassment had occurred and was continuing to occur during his ongoing employment. Def's Trial Ex. 49. Specifically, McKinney checked the boxes in the June 2019 EEOC charge indicating that he was claiming "retaliation" and "continuing action." *Id.* (EEOC charge stating "I complained to Respondent, and subsequently, I have been harassed."). As the Court explained, McKinney "was not required to list every instance of retaliatory harassing conduct he experienced" in his EEOC charge. *McKinney*, 2022 WL 2257246, at *12. Further, among other reasons, the Court found that the specific allegations to which CTA objected fell within the scope of his allegation of retaliatory harassment in his EEOC charge because they reasonably could be expected to grow out of an EEOC investigation into his more general charge of retaliation for having reported alleged race discrimination. *Id.* at *12.

CTA now argues that the post-August 2019 incidents of alleged retaliatory harassment, including the noose incident, belong to a separate, unexhausted employment practice because there was a significant time gap between alleged acts of harassment, a change in CTA managers, and the noose incident does not resemble the other alleged acts of harassment. Doc. 170 at 8-9; Doc. 181 at 1-3. This is an entirely new theory of exhaustion that was not disclosed by CTA prior to or at trial. A new trial motion brought pursuant to Rule 59(a) "is not merely intended to secure a forum for the relitigation of old matters or to afford the parties the opportunity to present the case under new theories; instead, the motion is a device properly used to correct manifest errors of law or fact or to present newly discovered evidence." *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1380 n. 4 (7th Cir. 1990) (quoting *Rosera v. Int'l Harvester Co.*, 109 F.R.D.

143, 148-49) (E.D. Wis. 1986)); *Sarkes Tarzian, Inc. v. U.S. Tr. Co. of Fla. Sav. Bank*, 168 F.

App'x 108, 113 (7th Cir. 2006) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 145 (2d Cir.

1998) (a motion for a new trial "'is not a vehicle for relitigating old issues, presenting the case

under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the

apple.'").

Furthermore, "[w]hen a defendant does not object to the admission of evidence during the

trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on

appeal." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 609-10 (7th Cir. 2006); *Love v. City of*

*Chicago*, 2021 WL 5917570, at *5 (7th Cir. 2021); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 727

(7th Cir. 1999) ("When a party fails to timely and properly object at trial to the admission of

evidence, the party is deemed to have waived the issue on appeal."). Whether McKinney

exhausted his post-August 2019 incidents of retaliatory harassment was not addressed in CTA's

trial brief.[2] Doc. 108 at 108-116. Nor did it object to this evidence in its motions *in limine*. Further,

CTA did not object at trial that all post-August 2019 incidents of alleged retaliatory harassment

were unexhausted. And there were no jury instructions on this issue. In sum, the CTA is

improperly attempting to raise a new theory of exhaustion now, after trial, to bolster its prior

exhaustion argument. This argument is waived.

Alternatively, even if CTA's current argument is not waived, the Court did not err in

allowing the admission of post-August 2019 incidents because CTA has not shown that the post-

---

[2] In its list of 43 contested issues of fact and/or law in the pretrial order, CTA listed: "40. Did Plaintiff fail
to exhaust administrative remedies with respect to his claim of discriminatory and/or retaliatory conduct?"
Doc. 108 at 23. Whether McKinney failed to exhaust his post-August 2019 incidents of retaliatory
harassment because of a time gap between incidents, a change in managers, and a noose incident which
was different in kind presents a distinct issue not addressed in the pretrial order. Thus, this single general
statement by CTA did not sufficiently preserve or give the Court fair notice of its current, more specific
exhaustion theory. Nor did exhaustion become a jury issue at trial.

August 2019 incidents were not part of the same retaliatory hostile work environment practice as the pre-August 2019 incidents. CTA cites *Morgan v. National R.R. Passenger Corp.*, 536 U.S. 101 (2002) and *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 852 (7th Cir. 2019) for its exhaustion argument related to post-August 2019 incidents, which are cases that it never cited to the Court at summary judgment. In *Morgan*, the Supreme Court distinguished between claims involving discrete acts of discrimination or retaliation from claims alleging a hostile work environment for purposes of determining whether acts are time-barred. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. This means that "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citation omitted). Because "incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* at 118. As a result, to submit a timely charge, "the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment." *Id.*

Thus, "*Morgan* taught that, in general, 'the entire hostile work environment encompasses a single unlawful employment practice,' but cautioned that acts bearing 'no relation' to one another would belong to separate employment practices." *Ford*, 942 F.3d at 852 (quoting *Morgan*, 536 U.S. at 117-18). Applying *Morgan*, the Seventh Circuit has identified various factors that should guide the "relatedness" inquiry, including whether there is a gap in time between incidents, change in management, or prompt and appropriate correction by the employer. *Ford*, 942 F.3d at 852-54; *Morgan*, 536 U.S. at 118 (an incident that "had no relation to the [other] acts . . . , or for some

other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim" could sever a hostile work environment claim."

"The simplest factor is time: [a] significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment claim." *Id*. at 852. But "[e]pisodes of harassment comprise "isolated incidents," rather than "continuous conduct," only where there are years-long gaps between them." *Elliott v. Bd. of Educ. of City of Chicago*, 2022 WL 874649, at *5 (N.D. Ill. March 24, 2022) (citing *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017) (holding that the continuing violation doctrine did not apply where there was a gap of "two or three years" between episodes of harassment); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 709 (7th Cir. 2002) (same, where there was a "six-year, three-year and two-year gap, respectively, between each discrete act" of discrimination)); *see also Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2002) (gap of more than three years severed events).

Here, McKinney's transfer to McCann's group in August 2019 did not result in a "significant gap" between alleged incidents of retaliatory harassment. The evidence presented at trial was consistent with McKinney suffering retaliatory harassment through June 2019 while he was still in Simmons' group and the harassment immediately continuing in August 2019 after he transferred into McCann's group with the denial of necessary keys (August 2019) and then later, with the denial of tools (various dates), the noose incident (July 16, 2020), and the assignment to work on stingers alone (September 2020). Trial Tr. 226:16-19, 249:18-260:20, 263:13-265:9, 266:6-268:16, 379:8-381:5, 484:5-493:23, 531:14-534:4. Among other incidents, the denial of necessary keys and tools occurred when McKinney transferred back to Simmons' group in February 2021 and then again, when Simmons retired and McCann took over the light rail maintenance group. *Id*. at 260:21-263:12, 265:12-266:5, 458:24-459:5, 487:4-13, 488:11-493:23.

Further, Gabriel ("Gabe") Hernandez testified at trial that in his role as union steward, he was aware that McKinney "had a lot of problems with Joe Simmons" and McKinney had "similar problems with Mr. McCann." *Id*. at 722:24-723:13. Thus, the evidence at trial showed that this was a continuing course of behavior pre- and post- August 2019, not separate distinct employment practices, and the time gap between these incidents is not so large that it could constitute a break in the sequence.

Nor has CTA shown that was there a significant gap between McKinney's April 2019 internal EEO complaint and his later internal EEO complaint about the noose incident. CTA asserts that after McKinney's April 2019 internal EEO complaint, "the CTA did not hear from Plaintiff until almost two years later, in March 2021, when he filed his third internal EEO claim" about the noose. Doc. 170 at 8-9. That assertion is not entirely correct. After McKinney filed his April 2019 internal EEO complaint, McKinney filed a June 14, 2019 EEOC charge alleging retaliatory harassment, listing "06-14-2019" as the date of the latest act of harassment, and checking the box for "continuing action." Def's Trial Ex. 49.

In any event, the gap between McKinney's EEOC charge and his internal EEOC complaint in March 2021 does not prevent the incidents of post-August 2019 retaliatory harassment from being considered to support McKinney's hostile work environment claim. CTA relies on the 18-month gap without incident known to the employer in *Ford* to argue that the post-August 2019 incidents here present a second, unexhausted retaliatory harassment employment practice. *Ford*, 942 F.3d at 852-53. However, *Ford* went on to find that the employer had taken an "intervening remedial action" (the third relatedness factor) at the beginning of the 18-month gap to bring an end to the first unlawful employment practice at issue. *Id*. at 854. CTA does not argue that it satisfied the third factor by taking prompt and remedial action against Simmons. "[P]rompt and appropriate

corrective action reasonably likely to prevent the harassment from recurring . . . [c]an suffice[] to sever the hostile work environment claim." *Id*. at 853. However, an "incidental" action by the employer "not calculated to address the harassment does not necessarily affect a hostile environment claim against the employer." *Id*. at 854. This factor does not prevent considering the post-August 2019 incidents as part of the same unlawful employment practice because when McKinney voluntarily picked into McCann's group it was not a "corrective action" and "not calculated to address the harassment." *Id*. at 853-54. "Only a transfer that amounts to 'intervening action by the employer' can close out a distinct unlawful employment practice." *Id*. at 854. This key fact distinguishes this case from *Ford*, where the employer permanently removed the alleged harassers to separate them from the plaintiff. *Id*.

CTA also claims that allowing McKinney to raise the post-August 2019 incidents of retaliatory harassment in this case undermines one of the purposes of an EEOC charge, which is "notice to the party accused of harassment, so that it may take correction action." Doc. 170 at 7. It is true that one of the primary purposes of the EEOC exhaustion requirement is to "give[] the employer notice of the employee's grievances." *Tyburski v. City of Chicago*, 964 F.3d 590, 601 (7th Cir. 2020). But here, Van Johnson, CTA's Manager of Employee Relations and Human Resources, testified at trial that when an EEOC charge is filed, CTA ceases "conducting any type of investigation that might have been going on at that time," so it is not clear how notice after the filing of the EEOC charge would be relevant here. Doc. 106:10-1007:2. The second purpose of the EEOC charge requirement is to "give[] the EEOC and the employer a chance to settle the dispute." *Tyburski*, 964 F.3d at 601. This purpose would not be frustrated by considering the incidents in Simmons' group and McCann's group part of the same retaliatory hostile work environment because the EEOC and the CTA had a chance to informally resolve McKinney's

retaliatory harassment claim, including the post-August 2019 incidents, until August 14, 2020, when the EEOC issued its notice of dismissal and right to sue letter. Def's Trial Ex. 51; Trial Tr. 523:19-24.

Next, CTA argues that the post-August 2019 incidents of retaliatory harassment, including the noose incident, occurred after CTA made changes in management: (1) Facility Maintenance management (James D'Amico to Lenny Romano in May 2019); (2) Facility Maintenance group (Messina began in May 2019); internal EEO investigators (Van Johnson to Tricia Donelan in September 2019).[3] Doc. 170 at 8; Doc. 181 at 2. It is true that "[a] change in managers can affect whether incidents are related" because "the action of supervisors impart vicarious liability to the employer for discriminatory harassment." *Ford*, 942 F.3d at 853 (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). However, "routine personnel actions," such as a retirement or a promotion, not taken to alleviate the harassment are less significant." *Id.*; *Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007). Here, this factor does not weigh against considering the post-August 2019 incidents of harassment to be a part of the same unlawful employment practice because there is nothing in the trial record that shows that these management personnel changes were "in any way intended to address the environment created" in Simmons' group. *Vickers*, 493 F.3d at 199 (cited in *Ford*, 942 at 853).

Finally, CTA's claim that the post-August 2019 acts of retaliatory harassment, including the noose incident, were so different in kind to the incidents he encountered pre-August 2019 that they were not part of the same hostile work environment is not relevant to whether the Simmons group incidents and the McCann group incidents constitute one, continuous hostile work environment. Doc. 170 at 9; Doc. 181 at 2-3. The Seventh Circuit has made clear that whether the

---

[3] CTA also notes the different alleged harassers (Simmons and McCann), but the "harassers' identities" do not bear on the relatedness inquiry. Doc. 170 at 8; Doc. 181 at 2; *Ford*, 942 at 853.

harassers' "'harassed in distinct or similar fashions' do[es] not bear on the [relatedness] inquiry." *Ford*, 942 F.3d at 853. "This is because the employer—not its employees—must comply with Title VII, so we look to the employer's response to the allegations of misconduct rather than the contours of the misconduct itself." *Milligan-Grimstad*, 877 F.3d 712.

In conclusion, and to be clear, this new theory of exhaustion of administrative remedies, a question of law, has been raised for the first time in a Rule 59(a) motion. This argument was not raised at summary judgment and was not a trial issue. It is improper to raise it now, after a jury trial, on a Rule 59(a) motion. Even so, the Court has addressed the issue and found that there is no merit to CTA's argument that the alleged incidents of retaliatory harassment that took place after McKinney voluntarily picked into McCann's South Side garage/facilities group in August 2019 constituted a separate employment practice under the relatedness factors requiring a second EEOC charge. For all these reasons, CTA's motion for new trial on this issue is denied.

## II.    Knowledge of Protected Activity

CTA also contends that the jury's verdict is against the manifest weight of the evidence because McKinney failed to prove a causal connection between his protected activity and the retaliatory harassment he suffered. More specifically, CTA says that there is no evidence that Simmons and the other coworkers responsible for the retaliatory harassment were aware of McKinney's race discrimination claims, so they could not have retaliated against him on the basis of his complaints. To prevail on his claim of retaliatory harassment, McKinney must establish a causal link between his protected activity and his coworkers' conduct. *Stutler v. Illinois Dept't of Corr.*, 263 F.3d 698, 704 (7th Cir. 2001). In other words, McKinney must establish not only that his claims were protected activity under Title VII, but also that Simmons and the relevant coworkers were aware that he engaged in protected activity when the alleged retaliatory acts took

13

place. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155-56 (7th Cir. 2021); *Khungar v. Access Community Health Network*, 985 F.3d 565, 578 (7th Cir. 2021); *Kuhn v. United Airlines, Inc.*, 640 F. App'x 534, 539 (7th Cir. 2016) ("At a minimum, a casual connection requires that the relevant decision-makers were aware of the protected activity at the time they took the adverse action.").

McKinney engaged in statutorily protected activity when he explicitly complained about race discrimination in his internal EEO complaint in October 2018.[4] Doc. 170-4 at 2-5; *Miller*, 20 F.4th at 1155 ("A complaint of discrimination is a protected activity under Title VII . . . if the discrimination is based on a protected characteristic like race.").  CTA insists, however, that McKinney did not establish any casual connection between the filing of race discrimination complaints and any subsequent actions taken against him because Simmons testified that he did not know, until cross-examination at trial, that McKinney's first internal EEO complaint charged him with race discrimination.

The jury's finding that McKinney's coworkers' conduct occurred because he complained of race discrimination was not against the manifest weight of the evidence.  It was up to the jury to determine whether Simmons understood that McKinney's first internal EEO complaint in October 2018 was racial in nature at the time the alleged retaliation took place. *Thompson v. Proviso Twp. High Sch. Dist. 209*, 2003 WL 21638808, at *10 (N.D. Ill. July 10, 2003).  It is true that Simmons did not admit to knowing that McKinney's initial EEO complaint accused him of race discrimination at the time of the alleged retaliation. Trial Tr. 945:5-946:7.  It is also true that

---

[4] McKinney engaged in additional statutorily protected activity by submitting an EEOC charge in June 2019, alleging, among other things, that he was subject to race discrimination when he was "transferred to a different worksite." Def's Trial Ex. 49; *Koty v. DuPage County, Illinois*, 900 F.3d 515, 520 (7th Cir. 2018).

Simmons claimed that the first time he heard that McKinney had accused him of race discrimination was on cross-examination at trial.[5] *Id*. at 945:9-11.

But the jury was not required to believe Simmons, and circumstantial evidence can be enough to prove knowledge of protected activity. Importantly, Simmons testified that he knew McKinney filed an "EEO complaint" against him and he was upset about McKinney's EEO complaint. Trial Tr. 946:14-947:12. Simmons talked to Gabe Hernandez and Bob Castro, the union business agent, about McKinney's complaint at the time it was made. *Id*. at 947:5-10. Simmons also testified that he knew McKinney's EEO complaint related to Simmons' decision to move McKinney out of the light maintenance rail group into the North Side garage/facilities group. *Id*. at 947:5-10; 953:10-18. The jury was permitted to make reasonable inferences that the EEO complaint was race-related: an African American electrician complained in an "EEO complaint" that his white foreman involuntarily moved him from his picked location and replaced him with a white electrician. Moreover, the term "EEO complaint" is ordinarily understood to refer to an Equal Employment Opportunity complaint of discrimination or harassment on the basis of a protected status. In this context, it was reasonable for the jury to determine that Simmons' testimony that he did not know until the middle of trial that McKinney had charged him with race discrimination was not credible, thereby raising the inference that he was lying about his lack of knowledge of McKinney's protected activity at the time of the alleged acts of retaliation. Furthermore, the Court, which presided over the trial and observed Simmons' demeanor and listened to his testimony, also finds that a reasonable jury could determine Simmons' testimony was not credible on this point.

---

[5] Simmons also testified that he first saw McKinney's October 2018 EEO complaint when McKinney's counsel showed it to him on cross-examination at trial. Trial Tr. 945:12-946:2.

CTA argues that just because Simmons knew that McKinney had filed an internal "EEO complaint" against him does not mean that Simmons knew that McKinney complained of race discrimination. CTA stresses that its internal EEO policy is not limited to complaints of race discrimination nor protected class discrimination, and suggests this fact implies that Simmons did not know the racial nature of McKinney's first internal EEO complaint. Doc. 181 at 4. Apart from race, CTA points out that its EEO policy includes sex, national origin, religion, marital status, sexual orientation, ancestry, age, military status, disability, genetic information, or any other status protected by applicable law. *Id*. CTA's EEO policy also applies to complaints of discrimination, harassment, bullying, or retaliation. Doc. 170-3 at 89-95. By definition, discrimination and harassment complaints are based on protected status. *Id*. at 90; Trial Tr. 959:16-960:2. Bullying, however, is not tied to any protected status. Bullying is repeated conduct that is offensive. Trial Tr. 960:11-20 ("Bullying, it can be repeated insults. It can be repeated intimidation. It can be yelling at someone repeatedly . . . It's an umbrella of things, but in general it's repeated actions that are offensive[.]"). CTA's policy defines bullying as "[a]busive, repeated conduct that is threatening, humiliating, or intimidating or sabotages work performance that affects one or more persons. Bullying includes, but is not limited to, yelling, screaming, cursing or angry outbursts, constant and unfair criticism, or repeated insults or offensive gestures." Doc. 170-3- at 89.[6]

While CTA argues that it is "[j]ust as likely" that Simmons could have thought that McKinney's internal "EEO complaint" pertained to a "non-protected class category such as bullying or general harassment," the Court finds the circumstantial evidence to be sufficient for a reasonable jury to conclude that Simmons knew that McKinney alleged race discrimination. There

---

[6] CTA's EEO Policy defines retaliation as "[t]aking an Adverse Action against an employee because he or she engaged in Protected Activity." Doc. 170-3 at 90.

was no evidence presented at trial that Simmons believed that McKinney's first internal "EEO complaint" alleged bullying without a racial component.[7] Doc. 181 at 4-5. Simmons himself did not so testify. Moreover, Simmons testified that he knew McKinney's initial internal EEO complaint related to his moving McKinney out of the light maintenance rail group into the North Side garage/facilities group in October 2018, which does not qualify as "repeated conduct" within the meaning of CTA's EEO policy's definition of bullying.[8]

Moreover, other circumstantial evidence presented at trial shows that a reasonable jury could conclude that Simmons and others were aware of the racial nature of the complaint at the time of the alleged retaliation. McKinney testified that in early December 2018, Hernandez and Burnett told him that "everybody knew that Joe Simmons was targeting me because I was Black and because I fought against getting removed from my pick in October of that year when he tried to take me out of my pick and ended up replacing me with Michael Crudele." Trial Tr. 204:25-205:8. Hernandez and Burnett told McKinney he needed to apologize to Simmons to get his Red Line responsibilities and his CTA vehicle back. *Id*. at 205:10-11. This testimony indicates that Hernandez and Burnett were aware of the racial nature of McKinney's complaint concerning his removal from his picked position and the loss of his CTA vehicle during the time the allegedly retaliatory actions took place. A month earlier, in November 2018, Hernandez had told McKinney he could be back on the Red Line and have his CTA vehicle back (the two actions complained of in his October 2018 EEO complaint) if he would "stop making waves." *Id*. at 203:24-204:17.

---

[7] Contrary to CTA's assertion, its EEO policy does not cover "general harassment" without a protected class component. CTA's EEO policy defines harassment as "[o]ffensive behavior toward an individual because of his or her protected status." Doc. 170-3 at 90; *see also* Trial Tr. 959:16-21.

[8] There was no evidence at trial that Simmons mistakenly believed McKinney's initial internal "EEO complaint" alleged discrimination or harassment because of his membership in a protected status other than race.

Additionally, McKinney testified that in February 2019, Burnett told him that Simmons was a racist and "Simmons took the foreman spot that [Burnett] was supposed to have, and it was because of racism." *Id*. at 205:16-20.

McKinney also testified that Burnett said McKinney was being targeted because Simmons wanted McKinney "to pick out of the group or to find a way to fire me." Trial Tr. 205:21-23. According to McKinney's testimony, Burnett continued: "the only way I can get [Simmons] to back off of me was for me to receive the 'Toby tap,'" which was a reference to Kunta Kinte in the movie Roots. *Id*. at 205:23-206:4. McKinney further testified that Burnett told him: "You have to receive the Toby tap. That's the only way a black person will make it under Joe Simmons." *Id*. at 206:4-10. Finally, in April 2019, Burnett reported to McKinney that he had been appointed as McKinney's "personal foreman" by Simmons because Simmons and Hernandez wanted to "eradicate the problem." *Id*. at 219:18-221:14, 400:7-402:15. While Hernandez and Burnett specifically denied the comments attributed to them by McKinney, their credibility was for the jury to decide. *Id*. at 684:21-685:8, 687:21-688:8, 688:15-690:4, 690:18-25, 712:23-713:20, 719:19-720:6.

Additionally, there is no evidence in the trial record that Hernandez and Burnett were unaware of McKinney's protected activity during the time the allegedly retaliatory actions took place. Neither Hernandez nor Burnett were asked at trial—and therefore they did not address—whether they knew of McKinney's October 2018 internal race discrimination claim or generally knew that McKinney had accused Simmons of race discrimination during the times that are relevant.[9] Given the supervisory relationship between foreman Simmons and Hernandez and

---

[9] CTA argues that Hernandez and Burnett "testified that they did not know about [McKinney's] EEO complaints and claims of race discrimination." Doc. 170 at 10. The cited testimony does not support that conclusion. Trial Tr. 687:11-688:14, 724:16-725:8. Moreover, when asked if he was ever involved in any retaliation against McKinney for filing a claim of race discrimination, Burnett did not deny knowing that

Burnett and their repeated interactions, including discussing getting rid of McKinney (*i.e.*, "eradicate the problem"), Simmons' knowledge of McKinney's protected activity at the time the alleged retaliation took place can be reasonably inferred from Hernandez's and Burnett's knowledge.

Furthermore, James McKinney III (no relation to Plaintiff), a retired CTA electrician, testified that he heard about alleged racial discrimination by CTA against McKinney from McKinney and "from others as well." Trial Tr. 664:10-13; 670:2-5. George Lewis, another electrician and foreman of the subway group, testified that McKinney told him about his allegations of racial incidents and that Lewis had a conversation with Burnett about some of those complaints. *Id*. at 563:13-24. Based on the totality of the evidence submitted, a reasonable jury could find that it is more probable than not that Simmons and the other relevant coworkers (including Hernandez and Burnett) were aware of McKinney's October 2018 complaint of race

---

McKinney had a filed a claim of race discrimination. *Id*. at 691:1-6; *see also id*. at 690:5-8. On direct examination, Hernandez denied retaliating against McKinney for filing a complaint with the EEOC. Trial Tr. 724:25-725:2. However, Hernandez did not testify on direct examination—he was not asked—whether he knew about McKinney's initial EEO complaint of race discrimination during the relevant time frame. Hernandez never testified (again, he was not asked), that he did not retaliate against McKinney for filing his initial EEO complaint of race discrimination. *Id*. at 724:14-725:8.

CTA's brief similarly states that electrician George Lewis and Lenny Romano, CTA's general manager of Facility Maintenance and Facility Fleet Services, testified that they did not know about McKinney's EEO complaints and claims of race discrimination. But Lewis' cited testimony does not support CTA's position. Trial Tr. at 563:13-19. Moreover, Romano testified about a meeting in March of 2019 with McKinney, Simmons, Hernandez as chief union steward, Romano, and Tony LaPorte, another union business agent. *Id*. at 869:12-21. In the testimony cited by CTA, Romano stated that he did not recall McKinney bringing up the subject of racial discrimination or retaliation and harassment because of his race during that particular meeting. *Id*. at 870:9-14. Romano also testified that McKinney had never discussed racial discrimination or harassment because of his race with Romano. *Id*. at 870:15-17. But Romano did not deny knowing about McKinney's EEO complaints and claims of race discrimination. In fact, Romano testified that in May 2019, he learned of the April 2019 internal "EEO claim" filed by McKinney and "what the complaints were from the EEO," which included his prior complaints about his vehicle being taken away and his move from his picked position to the North Side garage/facilities group. *Id*. at 826:20-827:12, 827:21-828:2. Romano then interviewed McKinney and Simmons about McKinney's complaints to EEO as part of a follow-up fact-finding investigation. *Id*.

discrimination against Simmons at the time of the alleged acts of retaliation. CTA is therefore not entitled to a new trial on this basis.

## III.     Admission of Evidence at Trial

CTA also maintains that the Court committed several evidentiary errors which prejudiced CTA's defense and merit a new trial. Evidentiary errors warrant a new trial only "if the evidentiary errors had 'a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice.'" *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 812 (7th Cir. 2021) (quoting *Fields v. City of Chicago*, 981 F.3d 534, 544 (7th Cir. 2020)). "In other words," if there was a "flawed" evidentiary ruling, "there must be a significant chance that [it] affected the outcome of the trial." *Burton v. City of Zion*, 901 F.3d 772, 778 (7th Cir. 2018). A party seeking a new trial based on erroneous evidentiary rulings bears a "heavy burden." *Love v. City of Chicago*, 2021 WL 5917570, at *4 (7th Cir. 2021) (quoting *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001)). Finally, "courts have considerable discretion in deciding whether to exclude evidence under Rule 403." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021).

### A.     Admission of McKinney's Testimony About Statements By Hernandez and Burnett

CTA argues the Court erred in admitting McKinney's trial testimony about three statements made by Hernandez and/or Burnett to McKinney over CTA's hearsay objections. Specifically, the Motion concerns the following statements:

1.     In November 2018, immediately after hearing stand-in foreman, Bob Schak, yelling at McKinney, Hernandez's comment to McKinney that "you can have your service vehicle back and you can be back on the red line. All you have to do is stop making waves." Trial Tr. 203:20-25, 204:10-17.

2.     In December 2018, Hernandez's and Burnett's statement to McKinney that "everybody knew that Joe Simmons was targeting me because I was Black and

20

because I fought against getting removed from my pick in October of that year when he tried to take me out of my pick and he ended up replacing me with Michael Crudele. . . . They told me I need to apologize to Joe Simmons so I can get my truck back and get the red line responsibilities back." *Id*. at 204:23-205:11.

3. In February 2019, Burnett's comment to McKinney that Simmons was a racist and the only way McKinney could "get him to back off" was "to receive the 'Toby tap.'" *Id*. at 205:12-24.

The Court ruled that these statements were non-hearsay statements of party opponents. Trial Tr. 203:24-206:7.[10]

McKinney's reports of what Hernandez and Burnett told him are not hearsay because they qualify as an admission by a party opponent under Rule 801(d)(2)(D). A statement is not hearsay if it "is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" Fed. R. Evid. 801(d)(2)(D). The Seventh Circuit has advised that "[f]or an agent's statements regarding an employment action to constitute an admission, she need not have been personally involved in the action, but her duties must encompass some responsibility related to 'the decisionmaking process affecting the employment action.'" *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (quoting *Simple v. Walgreens Co.*, 511 F.3d 668, 672 (7th Cir. 2007)). Thus, where the declarant is "not personally

---

[10] In its seventh motion *in limine*, CTA moved pursuant to Fed. R. Evid. 801(d)(2)(D), to preclude admission of all out-of-court statements by CTA employees Simmons, Burnett, Duffy McCann, and Van Johnson unless it was established that they were supervisors with the authority to hire, fire, demote, promote, transfer, or discipline McKinney at the time such statements were made. The Court denied the motion because Rule 801(d)(2)(D) does not restrict party admissions to supervisors who had the power to hire/fire/demote/promote/transfer/discipline the declarant. Doc. 146 at 35:14-37:20. "While the hiring/firing/promoting/demoting decisionmaking authority of the declarant may be critical in employment cases in which the admission deals with hiring/firing/promoting/demoting-type decisions, no similar requirement exists in other contexts." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003). Here, the statements involved decisions related to the allegedly retaliatory harassment of McKinney, not hiring/firing/promotion/demoting-type decisions.

involved in the [retaliatory] promotional decisions at issue" and her duties do not involve any part of the process, her statements are inadmissible hearsay. *Id*. at 793. However, where an employee "supervised and reviewed plaintiff" and was consulted about the allegedly discriminatory appointment or was an "advisor to the decision-maker," "participated in interviews," discussed employees' performance," and communicated news of termination, his statements are admissible as statements by a party's agent under Rule 801(d)(2)(D). *Id*. at 793 (citing *Simple*, 511 F.3d at 672 and *Nekolny v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981)).

CTA argues that Hernandez's statements did not concern a matter with the scope of his employment because Hernandez had no authority to assign CTA vehicles, assign electricians to various locations, or otherwise direct their performance. CTA also contends that Burnett's statements were not within the scope of his employment because he had no supervisory authority over Simmons and he was not privy to the reasons Simmons removed McKinney from his picked spot or asked him to perform other work assignments. It is correct that as an electrician and union steward, Hernandez did not have authority to assign CTA vehicles, assign coworkers to various locations, or otherwise direct coworkers' performance and that Burnett had no supervisory authority over Simmons. However, these facts do not rule out Hernandez and Burnett being "involved in the decisionmaking process affecting the employment action." *Makowksi v. SmithAmundesen LLC*, 662 F.3d 818, 823 (7th Cir. 2011). "Involvement in the process leading up to employment action at issue is enough to make an employee's statement an admission." *Id*. at 822-23. Instead, McKinney offered evidence that both Hernandez and Burnett were involved in the decisionmaking process related to the alleged retaliatory actions and personally participated in some of the incidents McKinney claimed were part of the retaliatory harassment.

22

The evidence showed that Simmons appointed Burnett to be McKinney's "personal foreman" with the power to direct McKinney's work and that he was not going to assist McKinney on work assignments because Simmons and Hernandez wanted to get rid of McKinney ("eradicate the problem"). Trial Tr. 218:25-220:15; 400:4-410:6. This evidence suggests that Hernandez and Burnett "were privy to or participated" in the decisions affecting McKinney's work conditions and assignments. *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998). Moreover, Burnett was Simmons' acting foreman for 17 years. As acting foreman for Simmons, Burnett had supervisory authority over McKinney, and thus had direct involvement in the decision-making process affecting McKinney's work assignments and the terms and conditions of his employment. Because there was sufficient evidence that Hernandez and Burnett were involved in the retaliatory process and their alleged statements concern the retaliatory reason for the actions and how McKinney could stop the retaliatory harassing acts, there statements are admissible as statements by a party opponent.

Alternatively, these comments by the union steward (Hernandez) and acting foreman (Burnett) to an African American electrician that he should "stop making waves," apologize to his alleged discriminator, and withdraw his complaint of race discrimination to stop the retaliatory harassing activity contributed to the retaliatory hostile work environment. Thus, "to the extent those statements are offered as examples of harassing comments made to [McKinney] rather than for their truth, they are not hearsay" because they are being used to prove that the prior statements had been made and their effect on McKinney. *Vovillia v. Illinois Dep't of Hum. Servs.,* 2019 WL 2994533, at *6 (N.D. Ill. July 9, 2019); *United States v. Law*, 990 F.3d 1058, 1062 (7th Cir. 2021) ("When an out-of-court statement is offered for its effect on the listener, and not for its truth, it is not hearsay."). McKinney testified that he understood the first comment by Hernandez to mean

that Hernandez wanted McKinney to stop complaining about race discrimination and he did not want McKinney to defend himself. Trial Tr. 204:18-22, 534:25-535:20. McKinney testified that he interpreted Burnett's "Toby tap" statement as indicating that he had to accept Simmons' decision to remove him from his picked position and should withdraw his complaint of race discrimination. *Id*. at 205:25-206:10. And to the extent Hernandez's and Burnett's statements are offered for their truth, they are statements of their then-existing state of mind—their knowledge of McKinney's protected activity and their intent to take retaliatory actions against McKinney if he did not "stop making waves," apologize to Simmons, and withdraw his complaint of race discrimination. Such statements are not excluded by the hearsay rule. Fed. R. Evid. 803(3); *Flanagan v. Office of Chief Judge of Circuit Court of Cook County, Ill.*, 893 F.3d 372, 375 (7th Cir. 2018) ("statements of a declarant's state of mind (motive, intent, or plan) are not excluded under the hearsay rule."). Because McKinney's challenged testimony was not erroneously admitted, admission of his testimony does not provide grounds for a new trial.[11]

### B. Admission of McKinney's Testimony About Statements By Union Representatives

CTA next objects to the admission of McKinney's testimony that union business agent Castro and union steward Hernandez told McKinney that once he "picked" into a group, he could not be moved out without his consent. Trial Tr. 186:8-13, 423:12-20. "A retaliation claim requires statutorily protected activity, which generally involves subjective and objective factors." *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019). Under the subjective factor, the plaintiff must "have a subjective (sincere, good faith) belief that he opposed an unlawful practice." *Id*. McKinney's testimony relaying Castro's and Hernandez's statements was not hearsay because it was not

---

[11] As an aside, the Court also notes that all the declarants at issue here testified at trial and had their opportunity to deny making these statements, and the jury had the ability to weigh the competing versions in reaching its verdict.

offered to prove the truth of their statements but instead offered to show that McKinney's October 2018 EEO complaint was protected activity because he had a good faith, reasonable belief that he was opposing race discrimination. *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) ("'[S]tatements introduced to show their effect on the listener' are not offered to prove the truth of the matter asserted."); *see* Doc. 170-4 at 2-5; Doc. 146 at 40:22-41:18. CTA claims that McKinney's belief that he was discriminated against on the basis of his race is "too far attenuated" from the alleged violation of the CBA regarding transferring of electricians. Doc. 170 at 16; Doc. 181 at 10. The Court disagrees. The union representatives' statements that McKinney could not be moved from his picked spot absent his consent is highly relevant to McKinney's belief that real reason for his transfer from his picked spot was discriminatory animus. The evidence was therefore not hearsay and admission of this testimony does not provide grounds for a new trial.

## C. Exclusion of Evidence of Overtime Assignments

Additionally, CTA argues that the Court erred in excluding evidence of McKinney's offers, refusals, and dismissed claims regarding overtime assignments. McKinney's Complaint in this case alleged, among other things, that he was denied overtime work because of his race and in retaliation for his complaint of race discrimination, but he voluntarily withdrew this part of his claims before trial. Doc. 1, ¶ 12. As a result, in the Final Pretrial Order, the parties stipulated that "[n]o testimony, documents, or arguments will be offered concerning any claim that Plaintiff Lasona McKinney was not properly offered overtime work, or was denied overtime work due to his race or in retaliation for his claims of race discrimination or as a form of harassment." Doc. 108 at 96-97.

Nonetheless, in CTA's view, the overtime evidence was relevant to show that McKinney was "provided adequate overtime opportunities" and it "undermined his initial claim that he was

denied overtime based on his race." Doc. 170 at 16. McKinney sought to exclude this evidence in his second motion *in limine*. Doc. 107 at 2-3; *see also* Doc.113 at 3-4; Doc. 114 at 6-9. Pursuant to Federal Rules of Evidence 401 and 403, the Court granted McKinney's motion *in limine* to exclude any evidence or argument that McKinney was given the opportunity to work overtime or declined offers of overtime work, which CTA itself stipulated was not a jury issue. Doc. 146 at 23:7-24:12; *see also* Doc. 141. CTA has no response to the fact that it stipulated that no evidence of overtime work offers or denials would be offered at trial.

      The Court remains convinced that the overtime evidence was properly excluded under Rules 401 and 403. Given the parties' stipulation, the racial and retaliatory harassment claims that went to trial were based on acts other than the denial of overtime. And contrary to CTA's assertion, this case was not about a "pattern of false complaints" by McKinney. Doc. 170 at 16. Nothing about the fact that McKinney dropped the overtime portion of his claims had any bearing on the merits of the other portions of his claims. As the Court explained in its ruling on the motion *in limine* filed by McKinney: "People drop claims for all sorts of reasons, not just because they are baseless. They may seek to narrow the case. They may determine that the evidence they thought [was] there isn't enough to meet the burden of proof. There are a lot of reasons [] why people drop claims, and the [CTA's] argument's too far-fetched." Trial Tr. 144 at 23:18-22. CTA wanted to go into detail about the specific times McKinney declined offers of overtime work. *See* Doc. 170-5 at 54:21-55:6 (CTA "started tracking the overtime, and they found out [that] 39 out of 40 times he turned down overtime."); Doc. 181 at 12 ("Plaintiff himself admitted during his deposition that he voluntarily declined 29 out of 30 overtime opportunities that were offered to him."). Therefore, as the Court explained, CTA's evidence concerning overtime work would have confused the jury by diverting their attention away from the alleged retaliatory acts at issue and created a risk that

the jury would mistakenly believe that a denial of overtime was part of McKinney's claims. Trial Tr. 144 at 23:23-24:2. Moreover, CTA's introduction of overtime evidence would have unnecessarily lengthened the trial because McKinney would then have needed to explain the details of why he declined each specific offer of overtime. And in any event, the jury heard Van Johnson, CTA's then Senior Coordinator of the EEO Programs, testify that he considered McKinney's October 2018 EEO complaint, which included his claims that he was denied overtime work in retaliation for complaining about being removed from his picked position, and determined there was no potential violation of the CTA's EEO policies. *Id.* at 976:23-977:23, 978:8-13. Accordingly, the Court's decision to exclude even more evidence concerning overtime assignment was not erroneous and does not warrant a new trial.

### D. Admission of McKinney's Testimony About His Parents' Cancer and His 2015 Strokes

The fourth evidentiary issue relates to CTA's sixth motion *in limine* asking the Court to exclude evidence that McKinney's emotional distress damages were heightened by his parents' health conditions. Doc. 106 at 5-7; Doc. 111 at 6; Doc. 115 at 6-8. CTA also challenges the admission of McKinney's testimony about his strokes in 2015 over CTA's relevance objection. Doc. 273:15-278:3. CTA characterizes both categories of evidence as "overly emotional." Doc. 181 at 5. It argues that this evidence should have been excluded under Rule 403 because its probative value was "substantially outweighed" by the danger of "unfair prejudice." Fed. R. Evid. 403; *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) ("Unfair prejudice is 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'") (quoting Fed. R. Evid. 403 Advisory Committee Notes on 1972 Proposed Rules).

27

The Court denied CTA's sixth motion *in limine* before trial (Doc. 146 at 33:35-35:13), and it reaches the same conclusion now in favor of admissibility under the Rule 403 balancing test. As McKinney established, the evidence of his parents' health conditions was probative with respect to the severity of his mental and emotional suffering when he was involuntarily moved from the South Side. McKinney offered evidence that at that time he "picked" into the light rail maintenance group in May 2018, his father was in the advance stages of cancer and his mother was dealing with breast cancer. Trial Tr.185:15-23. He testified that he "wanted to stay on the south side for that very reason." *Id*. at 185:22-23. Having to commute farther away from the South Side where his father lived and was receiving medical care made it difficult for McKinney to spend time with his parents and attend to his father during the end of his life. *Id*. at 190:7-25, 283:8-284:4. McKinney told Simmons that both his parents had cancer before Simmons moved McKinney out of his picked position. *Id*. at 185:24-186:3. The evidence of McKinney's parents' health conditions was thus highly probative of the increased emotional distress McKinney suffered from Simmons' allegedly retaliatory action in not allowing McKinney to return to the Red Line when he rejoined the light rail maintenance group a few weeks after he opposed his transfer out his picked spot.

CTA first argues that the prejudicial effect of McKinney's testimony about his father and counsel's references "was enormous, as the jury was undoubtedly moved by [his] emotional testimony about his dying father," but it has not shown how this testimony was *substantially* more prejudicial than probative. Doc. 170 at 18. Although the Court denied CTA's *motion in limine*, it offered to entertain an objection at trial if the argument about McKinney's parents' health conditions "gets overdone" which could "inflame the passion of the jurors" or a limiting instruction. Doc. 146 at 34:15-35:13. However, CTA's counsel did not reiterate his Rule 403

objection at trial or propose a limiting instruction, which the Court previously stated it would entertain. *See* Tr. 1/23/23, Doc. 45 at 35. The several references to McKinney's father's terminal cancer condition do not independently amount to error. Moreover, even considering the combined effect of these comments, they were brief and occurred sporadically over the course of a five-day trial. Further, during trial, CTA presented evidence of Simmons' offer to accommodate McKinney's need to care for his ailing father by moving him to the construction crew, working out of the 98th Street shop on the South Side. Trial Tr. 391:13-393:1, 943:13-944:21. Thus, CTA had the opportunity to present evidence and did argue to the jury that "whatever emotional pain [McKinney] sustained was attributable as much to his own decision" as to Simmons' actions. Doc. 170 at 18. In light of all the other evidence presented over the course of a multi-day trial, the brief mentions of McKinney's parents' health conditions were not so unfairly prejudicial that they had a substantial and injurious effect or influence on the jury or its verdict. Accordingly, CTA's motion for a new trial on this ground is denied.

Additionally, CTA contends that a new trial is warranted because the Court wrongly allowed McKinney to present evidence of his 2015 strokes over CTA's relevancy objection. McKinney sought to admit the evidence to show that he suffered anxiety due to the traumatic nature of his strokes, but after he recovered from the strokes, his anxiety disappeared and he was no longer anxious when he started working for the CTA. Trial Tr. at 275:11-24, 278:11-280:9. The Court permitted the testimony about McKinney's anxiety related to the strokes and his recovery therefrom to rebut CTA's argument that McKinney had a pre-existing anxiety condition. Specifically, CTA argued that McKinney suffered from lifelong anxiety. *Id*. at 276:2-3, 314:4-21, 328:12-15, 331:5-23. Thus, evidence that McKinney suffered from anxiety following strokes in 2015 but had recovered by the time he started working for the CTA was relevant to rebut CTA's

contention that something other than its conduct caused McKinney's anxiety and emotional damages.  Moreover, the probative value of this evidence was not substantially outweighed by the risk of any unfair prejudice under Rule 403.  Contrary to CTA's claim that McKinney "described *in minute detail* the circumstances of his two strokes" and testified "*at length* about the circumstances surrounding his strokes," McKinney's stroke testimony was minimal over the context of the five-day trial. Doc. 170 at 18; Doc. 181 at 6 (emphasis in original).  The direct examination of McKinney concerning his 2015 strokes spanned only four minutes and about three pages of trial transcript, so it did not go on at such length that it was unfairly prejudicial. Trial Tr. 273:15-974:25, 276:18-278:3.  Consequently, the Court finds no basis to grant a new trial based on the admission of McKinney's stroke testimony.

### E.    Admission of McKinney's Testimony About Therapy and Neurologist Dr. Connors

For its final evidentiary challenge, CTA raises two issues.  First, CTA contests the admission of McKinney's testimony that he received therapy.  Second, CTA argues that McKinney improperly testified about an opinion from his neurologist Dr. Connors at Rush.  Neither of these alleged evidentiary errors is grounds for a new trial.

The Court begins with McKinney's testimony that he started seeing a therapist in 2021 to "to help with [his] mental health" and at the time of the trial, he was seeing the therapist weekly. Trial Tr. 286:20-288:2.  CTA now argues that this testimony about McKinney's treatment was irrelevant because he provided no medical testimony linking his recent psychological therapy with the harm he allegedly sustained at the CTA.   First, at trial, CTA objected on the grounds that "this was subject to a motion in limine." *Id.* at 286:23.  In fact, CTA had only moved to bar evidence about his then-recent prescription for antidepressant medication. Doc. 117.  The Court granted that motion. Doc. 146 at 48.  CTA did not bring a motion *in limine* to bar any mention of McKinney's

therapist. At trial, McKinney was not asked to and did not testify to any antidepressants that had been prescribed or that he was taking. Thus, the basis for CTA's objection at trial was different than presented here, and this new basis raised in the Rule 59 motion is waived. *See United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988).

Second, even if not waived, the testimony was very limited in scope and need not have been barred on relevancy grounds. The Court did not permit McKinney to use the word "psychological therapy" to avoid any inferences that he had any kind of diagnosis. Trial Tr. 291:1-4. McKinney was also not permitted to testify to any medication he was taking or diagnosis he received about his emotional state. *Id.* Nor was any physician or therapist called at trial to testify on these issues. As the Court noted, this is "a garden variety emotional distress" case where McKinney introduced no medical testimony linking the alleged unlawful action with his emotional state. *Id.* at 290:18-291:6. While there is no set definition of "garden variety," it is generally deemed to be not medical-based damages but those that relate to humiliation, embarrassment or similar emotions. *Ikumen v Bayview Loan Servicing, LLC,* 2018 WL 7891978, at *1 (N.D. Ill. Jul 27, 2018). McKinney's brief mention (approximately one page of the trial transcript) to seeing a therapist in 2021 does not veer so far into medical diagnosis or treatment that it moves this case out of the "garden variety" emotional damages realm. Therapists are not to be confused with psychologist or psychiatrist. In our modern era, many people see therapists for a variety of reasons, without a firm medical diagnosis or condition, and simply seeing a therapist does not, without more, imply a medical diagnosis or condition. Trial Tr. 287: 3-4 (according to McKinney's counsel, "his testimony isn't about medical testimony, it's about the therapy he has received"). McKinney testified to seeing a therapist in the broader context of explaining how the harassment and retaliation events affected his life. Rather than going into the kind of therapy he had, he

testified about the difficulty he had deciding to see a therapist, given his family's "old-school" beliefs about therapy. *Id*. at 287:13-23. Right after that, he discussed his basement bar where he could not bring himself to have people over to socialize with, and did not want to spend time with family during his birthday or holidays. *Id*. at 288:4-23. Thus, the context in which this was mentioned is an important component in determining that its admission was not error.

Third, even if it had been error to allow McKinney to introduce the fact of his therapy treatment, CTA has not met its burden of showing that there is a significant chance the alleged error affected the outcome of the trial. The challenged testimony was extremely brief and McKinney did not provide any details about his treatment, any psychological diagnosis, or any medical opinion. Trial Tr. 286:20, 287:10-288:2. McKinney's counsel mentioned "therapy" only once during his closing arguments and did not reference psychological therapy. *Id*. at 1074:11. As explained above, the Court denied admission of evidence that McKinney was prescribed an antidepressant, and that evidence was not admitted at trial. Doc. 146 at 47:7-48:16. Additionally, as further detailed below in Section IV, there was ample evidence of McKinney's emotional harm beyond this very limited testimony to sustain the jury's damage award. Under these circumstances and looking at the trial record as a whole, the admission of McKinney's therapy did not affect the outcome of the trial or the damages award.[12]

CTA further contends that McKinney improperly testified that his neurologist Dr. Connors at Rush provided a second opinion regarding his ability to return to work in 2016, following his recovery from his strokes in 2015. McKinney's description of Dr. Connors' opinion was elicited

_____

[12] CTA also claims that it was improper to admit McKinney's testimony in this regard because he did not amend his discovery responses with the identity or contact information of his psychological treater. Because CTA was provided with the name of McKinney's therapist during discovery, a new trial on this ground is improper. Doc. 177-1.

from CTA's *own c*ross-examination.  CTA's counsel tried to impeach McKinney's credibility with regard to statements he made to the Social Security Administration that he was unable to work beginning with his October 15, 2015 disability application. Trial Tr. at 298:4-300:2, 302:20-305:16, 318:12-325:21, 334:24-335:19, 339:22-340:10.  Counsel, for instance, questioned McKinney as follows:

> Q.      So you told the Social Security Administration on October 15, 2015, that you're able to work?
>
> A.      Okay.
>
> Q.      Is that right?
>
> A.      Um, yes, I guess that's what it says.
>
> Q.      Okay.  And your doctor had cleared you to work?
>
> A.      My neurologist did not.
>
> Q.      Your doctor had cleared you to work; correct?
>
> A.      Okay.
>
> Q.      Do you know what kind of doctor Dr. Fahey is?
>
> A.      I got a second opinion from Dr. Connors at Rush, and that became my neurologist.
>
> ***
>
> Q.      Okay.  So you have one doctor telling you you can go back to work.  You have your own personal physician telling you you can go back to work.  And you were saying in January 28th of 2016, you were not able to go back to work?
>
> A.      Yes, that's what I said.
>
> Q.      Okay.  What were you basing that on?
>
> A.      I was basing if off of the neurologist I was seeing.
>
> Q.      What neurologist?  Is there any evidence of a neurologist?  The only neurologist we've heard from so it is Dr. Fahey.

*** 

Q.     What neurologist?

A.     Dr. James O'Connor at Rush.

Q.     Okay.  And when did you see him?

A.     I started seeing him after I had the second stroke.  I did not trust the care I was getting from Dr. Fahey, so I left Ingalls, and I started going to Rush for my cardiologist and my neurologist.

*Id*. at 302:20-303:6, 325:3-21.  CTA's counsel did not object when McKinney testified about his neurologist or move to strike the testimony.  In redirect following cross-examination, McKinney clarified that he received a second opinion from Dr. Connors who eventually cleared him to return to work in June of 2016. *Id*. at 544:21-546:22.

CTA maintains that it is entitled to a new trial because McKinney did not disclose Dr. Connors in response to CTA's interrogatory seeking the identity of any physician from January 2016 to the present. But McKinney objected to this interrogatory on relevancy and burdensomeness grounds, and CTA did not move to compel a further response. *See* Fed. R. Civ. P. 33(b)(3) ("Each interrogatory must, *to the extent it is not objected to*, be answered separately and fully in writing under oath."); *see also BASF Corp. v. Old World Trading Co.*, 1992 WL 22201, at *3 (N.D. Ill. Jan. 31, 1992) (Old World now seeks to bar evidence from witnesses not included in the [interrogatory] response based on BASF's failure to supplement. Old World's argument is without merit. Had Old World successfully contested the objection, BASF would have had the duty to release the names. Old World, however, failed to move to compel a more complete answer or to notice the objection for a hearing. As a result, Old World has waived its right to seek supplementation under Fed. R. Civ. P. 26(e)."). Moreover, CTA's claim that McKinney's testimony about Dr. Connor's return to work opinion should have been excluded because

McKinney did not disclose him as an expert witness under Federal Rule of Civil Procedure 26(a)(2)(A) is without merit because McKinney did not call Dr. Connors to testify at trial.[13]

CTA also argues that the Court improperly admitted McKinney's testimony regarding Dr. Connors' statement about his medical condition because it was inadmissible hearsay. On cross-examination, CTA *did not object* to McKinney's testimony as hearsay, so the issue is waived. *United States. v. Church*, 970 F.2d 401, 408-09 (7th Cir. 1992). Moreover, if defense counsel felt that Dr. Connors' "second opinion" was inadmissible, he should not have continued to purse this line of questioning after eliciting the opinion. Trial Tr. 298:4-25, 302:20-303:25, 320:3-13, 324:11-22, 325:3-327:4, 334:24-335:19, 339:22-340:14, 552:25-553:10. Over CTA's hearsay objection, the Court allowed McKinney to testify on redirect about Dr. Connors with respect to whether McKinney was cleared to work, and McKinney's counsel tailored his questions to McKinney's statements on cross-examination. Trial Tr. 545:3-546:22. This ruling was correct. CTA brought up the issue of McKinney's representations to the Social Security Administration while cross-examining McKinney. McKinney's answers to defense counsel's questions explained why he told the Social Security Administration he was unable to work in October 2015 and January 2016. "[W]hen a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence." *Griffin v. Foley*, 542 F.3d 209, 219 (7th Cir. 2008) (quoting *United States v. Gilbertson*, 435 F.3d 790, 797 (7th Cir. 2006)); *United States v. Brendia*, 2000 WL 1716433, at *2 (7th Cir. 2000) ("We have held on a number of occasions that a defendant cannot 'open the door' to a line of testimony and then object to its admissibility when the testimony elicited is damaging."); *see also United States v. Carter*, 720 F.2d 941, 948 (7th Cir. 1983) ("A party cannot be permitted on one hand to introduce evidence which appears

---

[13] This argument is also waived because CTA did not raise the issue of Rule 26(a)(2)(A) until its reply brief. Doc. 181 at 11; *United States v. Snyder*, 71 F.4th 555, 577 (7th Cir. 2023).

favorable and then complain, after the circumstances are fully developed, because that evidence becomes detrimental to his cause."). This is exactly what CTA is doing here. CTA's counsel "opened the door" to this testimony from McKinney regarding Dr. Connors by placing McKinney's credibility at issue with respect to his representations in his disability filings that he was unable to work. Therefore, McKinney was properly permitted to advise the jury of the relevant facts on redirect and testify that Dr. Connors' second opinion supported his statements to the Social Security Administration in October 2015 and January 2016 that he was unable to work.[14]

## IV. Compensatory Damages Award

In its final request for post-trial relief, CTA seeks a new trial on damages or a remittitur. The jury awarded McKinney $99,000 for his emotional distress. CTA argues that the jury's damage award was excessive, not connected to the harm caused by CTA, and not in line with awards in similar cases. CTA does not suggest a remittitur amount.

In reviewing an award of compensatory damages, courts consider whether (1) the award is "monstrously excessive"; (2) there is a rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (quoting *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011)). A monstrously excessive award is one that is the product of "passion and prejudice." *Id*. (quoting *Fleming v. Cnty. of Kane*, 898 F.3d 553, 561 (7th Cir. 1990)). The monstrously excessive factor is just another way of asking whether there is a rational connection between the

---

[14] Indeed, at one point on cross-examination, CTA's counsel even told McKinney "unless you have a record, I don't want to hear about this other doctor." Trial Tr. 326:21-22. McKinney's counsel objected, and the objection was sustained as counsel's remark was "argumentative." Trial Tr. 326:23-327:4. The cross-examination, and this particular portion, shows that CTA's counsel preferred to spar with McKinney and attack his credibility (*i.e.* that he was lying about seeing a second neurologist) rather than move to strike the testimony. CTA cannot now complain about its choice of strategy after-the-fact.

award and the evidence. *Id*. In determining whether there is a rational relationship, "the district court must review the trial record as a whole in the light most favorable to the verdict." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). Finally, as the Seventh Circuit has explained, "[e]valuating issues as subjective and elusive as emotional damages is a task we leave in the first instance to the common sense and collective judgment of juries." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 388 (7th Cir. 2011).

CTA argues that a new trial on damages or a remittitur is warranted because this is a "garden variety emotional distress" case where no medical testimony was introduced to support McKinney's emotional injuries. CTA further argues the McKinney did not prove that he was entitled to $99,000 in compensatory damages because he continued working full-time, he did not seek mental health treatment until 2021, he did not take any medication to relieve his alleged symptoms, and there were other reasons for his feeling low during this time period, including his parents' health conditions, his father death, and his daughter moving out of his house after graduating from college. None of these reasons provide a basis to set aside the jury's award of compensatory damages. First, it is well settled that a plaintiff can support an award for nonpecuniary loss by relying solely on his own testimony about his emotional distress. *Vega v. Chicago park District*, 954 F.3d 996, 1008 (7th Cir. 2020); *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006) ("Medical support is not necessary to prove emotional injury in a Title VII case."). In this case, "[i]t was the jury's job to gauge [McKinney's] distress and determine an appropriate amount to compensate [him]. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1023 (7th Cir. 2016).

Second, considering the totality of the evidence presented at trial, the jury's award of $99,000 is neither monstrously excessive nor without a rational connection to the evidence

presented a trial. At trial, McKinney credibly and specifically explained the effects his coworkers'
treatment and the CTA's indifference to his complaints had on his life over more than a four-year
period. Trial Tr. 288:24-289:18. Prior to working for the CTA, McKinney was "in a good place,"
regularly socializing and volunteering in his community. Trial Tr. 278:14-279:18. McKinney
testified that during his first year at the CTA, he was in a "very happy, good place" because he had
a municipality job and his daughter had gone off to college. *Id*. at 279:22-280:9.

However, when asked about how things changed as a result of his coworkers' retaliatory
treatment, McKinney testified that he became extremely anxious, withdrew from other people, and
was mentally and physically drained by the stress at work. Trial Tr. at 547:19-548:9. He testified
that starting in 2019, he got in the habit "where I would leave work, go home, eat, take a shower
and get into bed," "so the day could end." *Id*. at 281:2-8. He also testified that he "didn't want to
be around people." *Id* at 281:12-22, 288:3-13. He stopped dating and did not interact as much
with family or friends. *Id*. He spent recent holidays and his 50th birthday alone. *Id*. at 288:14-23.
McKinney further testified that he was the sole custodial parent for his daughter from the time she
was age four and he was extremely close with his daughter. *Id*. at 269:22-272:6, 281:24-282:4.
Because of the problems he was dealing with at the CTA, McKinney did not have the emotional
strength to support his daughter during the last two years of her college life. *Id*. at 282:5-282:7.
McKinney testified: "I didn't have the space emotionally to deal with the stuff I'm dealing with
here and then with her, too. So I had to kind of leave her on an island where I would just send her
money, but I wouldn't talk to her as much. I wouldn't FaceTime. I couldn't be there for her." *Id*.
at 282:7-11. This was "very upsetting" to McKinney. *Id*. at 282:18. Further, there was evidence
that what happened to McKinney at the CTA affected his ability to see and care for his father at
the end of his life. *Id*. at 283:19-284:4. He "didn't have as much time with [his] father as [he]

otherwise would have" because he "didn't have the time or energy" and fell asleep some days at the hospital or hospice. *Id*. at 283:21-284:1. McKinney's testimony of emotional distress was corroborated by his coworker McKinney III. McKinney sought the help of McKinney III, a minister, for his emotional distress. *Id*. at 286:7-10. McKinney III testified that on several occasions, McKinney called him crying, "in distress," "emotional on the way to work and making statements that he just couldn't do it anymore," and they prayed together. *Id*. at 655:2-12.

McKinney also testified to the physical effects of the treatment he received at the CTA. McKinney testified that he had difficulty sleeping, experienced panic attacks, trouble breathing and swallowing, tightening in his stomach muscles, low sex drive, crying episodes, and gained 45 pounds. Trial Tr. 284:5-286:18, 341:22-14. Regarding the noose incident experienced at work, McKinney testified that he immediately had a panic attack and trouble breathing. *Id*. at 252:7-10. McKinney testified that the noose symbolized lynching and a threat to him that "if you keep crossing the line or if you do something that – you keep doing something that we don't want you to do, this is what's going to happen to you, you will get hung." *Id*. at 252:13-18. McKinney testified that the noose incident took the treatment he had experienced at the CTA to a "different level where now [he] felt unsafe as far as [his] life." *Id*. at 257:25-258:10. McKinney testified that he still has a number of these symptoms today. He testified that he has lived with symptoms of extreme anxiety, withdrawal from other people, and sleeplessness since 2019 and finding the hangman's noose still affects him today. *Id*. at 258:11-20, 547:19-548:9. The jury was permitted to credit this testimony and is sufficient to support the jury's compensatory damages award.

CTA argues that a $99,000 compensatory damages award is inconsistent with awards in similar or arguably more egregious cases. CTA cites several cases in which the compensatory damages award was no more than $75,000. *See David v. Caterpillar, Inc.,* 324 F.3d 851, 864 (7th

Cir. 2003) (affirming remittitur of $100,000 award to $50,000 for depression, anger, and humiliation, two-week period where plaintiff went home from work and straight to bed, stomach aches, and difficulty sleeping due to anxiety and stress for retaliatory denial of promotion); *Pickett v. Sheridan Health Care Center*, 610 F.3d 434, 446 (7th Cir. 2010) (upholding jury award of compensatory damages of $15,000 where plaintiff testified that she was very upset by how she was treated, felt embarrassed, and nearly became homeless as a result of retaliatory discharge); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 484 (7th Cir. 2003) (upholding award of $75,000 for emotional pain and suffering where plaintiff was terminated but found a new job within two months, he and his wife described the emotional impact plaintiff suffered, plaintiff sought church counseling one year after he was terminated, and plaintiff's wife was pregnant at the time and he was stressed about not being able to support his family due to his unemployment); *United States E.E.O.C v. AI Security Investigations, Ltd.*, 55 F.3d 1276, 1285-86 (7th Cir. 1995) (upholding award of $50,000 for emotional distress where terminally ill plaintiff did not seek professional treatment but testified that he experienced depression, rage, and fear after his discriminatory termination from a job that was a "major defining aspect" of his life and self-esteem); *Avitia v. Metro, Club of Chicago, Inc.*, 49 F.3d 1219, 1227-29 (7th Cir. 1995) (concluding remittitur of $10,500 in damages for emotional distress (half the jury's award of $21,000) was necessary where the plaintiff presented "so minimalist a case of nonpecuniary loss-a case so modest, so lacking in detail or structure" because his testimony consisted of a single answer, occupying only 14 lines of transcript, that he felt speechless and was crying on the day he was fired and could still feel the loss several years later, and he found a comparable replacement job in three months following retaliatory discharge).

The Court finds that the jury's award is roughly comparable to other awards, and the cases cited by CTA do not suggest otherwise. For example, in *David*, there was no evidence that the plaintiff's depression or other symptoms continued for any sustained period of time. *David v. Caterpillar, Inc.*, 185 F. Supp.2d 918, 924 (C.D. Ill. 2002), *aff'd* 324 F.3d 851 (7th Cir. 2003). But here, McKinney testified that his anxiety, social isolation, and sleeplessness has persisted for more than four years. McKinney also testified to more emotional harm and in greater detail than the plaintiff in *Avitia*. Moreover, none of the cases cited by CTA, except *David*, involved emotional distress accompanied by physical symptoms. McKinney testified to the physical manifestations of the stress he was under, such as difficulty sleeping, weight gain, stomach cramps, panic attacks, and crying episodes. McKinney's testimony also included a physical safety element. *Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394, 410 (7th Cir. 2010). McKinney was concerned about his physical safety on certain work assignments (the O'Hare fan room assignment and the installation of new stingers alone assignment). Trial Tr. 214:9-217:24, 263:13-265:9. McKinney's discovery of the noose, which the Seventh Circuit has recognized is a symbol of terror that is intended to arose fear, further distinguishes this case. *Porter v. Erie Foods Inter., Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). The noose incident caused McKinney to fear for his own physical safety. *Id.* (noting "the very real, very significant fear that such symbols inspire in those to whom they are targeted."). Additionally, the Court notes that the lower comparison awards cited by CTA are from significantly older cases. Accounting for inflation, "the current value of those awards is considerably greater." *AIC Sec. Investigations*, 55 F.3d at 1286 ("[c]omparability of awards must be adjusted for the changing value of money over time."); *Lampley*, 340 F.3d at 484; *Tullis v. Townley Engineering & Mfg. Co., Inc.*, 243 F.3d 1058, 1069 (7th Cir. 2001) (noting a plaintiff's

$50,000 award in 1988 was worth approximately $70,000 in 1999). Therefore, CTA's cases do not show that the award here is out of line with other awards in similar cases.

Other employment discrimination and retaliation cases are more on point, despite being awarded years earlier than the verdict in this case. *See Deloughery v. City of Chicago*, 422 F.3d 611, 619-21 (7th Cir. 2005) (upholding remittitur from $250,000 to $175,000 for emotional distress for a "highly motivated female police officer, with a family heritage in law enforcement" who did not seek professional help but testified she was "devastated" when she was retaliatorily denied a promotion, a coworker testified about the "demoralizing impact" on plaintiff, and defendant suggested the real source of her distress was her divorce or the stress of caring for small children); *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 714 (7th Cir. 2004) ("the jury could have reasonably concluded that awards in the range of $50,000 to $150,000 were necessary" where plaintiffs complained of continuing mental and physical ailments from problems at work in a discrimination and retaliation case); *Tullis*, 243 F.3d at 1067-69 (upholding $80,185.68 award for emotional distress damages where no physician or other professional testified that plaintiff suffered psychologically but plaintiff said he felt "low" and "degraded" when he was laid off and "back-stabbed" when the defendant opposed his unemployment claim and he experienced financial difficulties as a result of his unemployment in a retaliatory discharge case). Although none of these cases are precisely on point with this case, "an exact analogy is not necessary." *Farfaras*, 433 F.3d at 566. "Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Id*. ("Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive."). Because the $99,000 compensatory damages award reflects the trial testimony about persistent retaliatory actions by McKinney's coworkers, CTA's indifference to McKinney's

complaints, his ongoing mental and physical symptoms, the corroboration of his emotional distress by a coworker, and his fear for his physical safety, the damages award is not excessive and CTA's request for a new trial on damages or to reduce the jury's award is denied.

## CONCLUSION

In the end, this was a vigorously contested case, and the jury had to resolve important issues of credibility. The jury returned a split verdict which shows that the jury took their responsibility seriously by carefully weighing and considering the evidence as to each claim. The verdict on the retaliatory harassment claim was not against the weight of the evidence and the trial was not unfair to CTA. The jury returned an award of damages that was within the realm of reason in light of McKinney's testimony at trial. Accordingly, the Court will not second guess the jury's credibility judgments, and the verdict will not be disturbed. CTA's Rule 59 Motion for a New Trial [168] on the retaliatory harassment claim is denied.

**SO ORDERED.**

Dated: August 10, 2023

Sunil R. Harjani
United States Magistrate Judge